SCHWELB, Associate Judge:
This is an appeal by B.J.P. (the mother) from an order of the Superior Court modifying the child visitation provisions of a New York divorce decree. The mother has custody of the parties’ daughter; her former husband, R.W.P. (the father), has custody of their son. The substantive controversy has primarily focused upon the circumstances and conditions under which the father must be permitted to visit his daughter, but the order appealed from affects each parent’s right to visit the child who is in the other parent’s custody.
Although the mother, who was living in the District of Columbia with her daughter at the time this matter was heard in the Superior Court, did not challenge subject matter jurisdiction in the court below, and although she affirmatively invoked the Superior Court’s jurisdiction by requesting substantive relief in relation to the visitation issues, she now contends on appeal, for the first time since this proceeding was instituted, that the motions judge was without authority to modify the divorce decree. Specifically, she claims that, under the provisions of the federal Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A (1991), and the District’s Uniform Child Custody Jurisdiction Act (UCCJA), D.C.Code § 16-4501 et seq. (1989), the dispute was within the exclusive jurisdiction of the courts of New York. The mother also complains that the motions judge failed to make written findings of fact and that his order with respect to the parties’ substantive visitation rights and certain other issues constituted an abuse of discretion.
We conclude that the mother has waived the jurisdictional issue, and that her remaining contentions are unpersuasive. Accordingly, we affirm.
I.
THE FACTS
The mother married the father in California in May 1973. Their first child, Joshua, was born in June 1977. In 1980, the parties separated. For the ensuing three years, Joshua lived with his mother. The parties reunited in 1983, and their daughter, Jennifer, was born in February 1984. In February 1986, however, the parties separated once again, this time permanently. The father has since remarried.
The mother obtained a divorce from the father on February 1, 1988, in New York. An agreement which the parties had negotiated shortly after their separation in 1986 was incorporated, but not merged, into the divorce decree.
Under the terms of the separation agreement, Joshua was to live with his father and Jennifer was to live with her mother. The agreement provided that, because the parties were “reluctant to restrict visitation rights to any rigid schedule,” visitation was to occur at any time upon which the parties mutually agreed, provided that the visited child’s welfare would not be imperiled, nor the normal routine upset. The parties also agreed that the custodial parent would have “day-to-day jurisdiction of the child,” but that “all decisions of a substantial nature will be made by mutual agreement if time and circumstances reasonably permit.” Finally, the agreement required the mother, an oil company executive, to pay child support to the father in the amount of $400 per month during ten months of the year.
At the time of the divorce, both parties were apparently[1] living in New Jersey. In early 1989, the mother moved from New Jersey to New York. In September 1989, the mother was transferred by her employer to Washington, D.C. At the motions hearing, which took place on January 8, 1991, the mother testified that she lived with Jennifer at an address in northwest Washington, D.C., and that “if I get to go back to New York ... at this point, that is not in the near future.” *76 At all relevant times, the father was living with Joshua in Montclair, New Jersey.
Beginning in late 1988, the relationship between the mother and father deteriorated. Shortly before Christmas of that year, the father, apparently annoyed because the mother had made Jennifer available to him two hours late (according to him) or half an hour late (according to the mother), returned his daughter to the mother at about 8:30 p.m. instead of 4:30 p.m. The mother, frantic with worry, called the police and left “numerous” messages on the father’s answering service. The father’s response to the situation was not especially considerate,[2] and the mother was understandably very upset.
During the summer of 1990, Joshua was diagnosed as having a large malignant tumor in the area of his jaw. Fortunately, it was subsequently discovered that the tumor was in fact benign. During the youngster’s illness, the father made a number of treatment decisions without consulting the mother. In addition, he did not advise the mother that Joshua had undergone reconstructive surgery until after the fact. The father also professed not to recall whether he had discussed with the mother the question whether Joshua should be told of his condition, nor did he remember whether he had told the mother after the fact that he had made this information known to their son. Unsurprisingly, these events were also quite distressing to the mother.[3]
As a result of these and perhaps other incidents, the mother restricted the father’s contact with Jennifer, and did not permit overnight visitation; the father apparently interposed difficulties in relation to the mother’s visits to Joshua. The mother also stopped making her child support payments and, by the time of the January 1991 hearing, the mother had developed an arrearage of $11,600, which represented her obligation for a period of almost three years.
On August 30, 1990, dissatisfied with the mother’s failure to permit overnight visita *77 tion with Jennifer and to pay child support as required, the father filed a motion for civil contempt and supplemental relief. The mother ultimately filed a “Counter-Motion for Enforcement of Order.” Each party proposed a visitation schedule for both Joshua and Jennifer.
On the eve of the hearing on these cross-motions, which took place on January 8,1991, the mother paid the sums owing for child support into the registry of the court, and the father withdrew his civil contempt motion. After hearing testimony from both parties and from the father’s second wife, as well as argument of counsel, the motions judge issued an oral order from the bench, which was followed on May 28, 1991 by a formal written order. The judge set a specific visitation schedule for each child, including overnight visitation. He also directed that the custodial parent would be the prime decision-maker with respect to medical decisions of a substantial nature affecting the child in his or her custody, although consultation with the other parent was required. The judge denied the father’s request for an award of counsel fees. This appeal followed.
II.
LEGAL DISCUSSION
As previously noted, the mother, who was then living in Washington, D.C. with Jennifer and had no plans to move anywhere else, did not interpose any objection in the . trial court to the exercise of jurisdiction by that court, which was geographically the most convenient to her but least convenient to the father, a resident of New Jersey.[4] On the contrary, the mother insisted that the Superior Court had jurisdiction,[5] and her attorney requested, orally and in writing, that the motions judge set a visitation schedule consistent with her demands. Indeed, the arguments made by the mother’s counsel to the motions judge were the very antithesis of those on which she relies in this court. Counsel asserted at the outset of the motions hearing that
we do not want to leave this court and have [the mother] threatened with what we have heard she’s being threatened with, which is that [counsel for the father] would like to go back to New Jersey or to New York or some other jurisdiction and try to sue her over this again.
Notwithstanding her arguments to the motions judge, the mother, who no longer lives in the District,[6] is now demanding that the proceedings in the Superior Court be vacated and that the visitation issue be considered all over again by a court in New York. She contends that the District is not the “home state” of either Jennifer or Joshua, see PKPA § 1738A(b)(4), UCCJA § 16-4502(5);[7] that New York, the state in which the parties were divorced, still had a significant connection with the case and thus retained continuing jurisdiction pursuant to PKPA § 1738A(c)(2)(E), (d),[8] and that the Superior *78 Court was therefore without authority to proceed.
In light of the position taken by the mother below, counsel for the father had no idea, at the time of the motions hearing, that the jurisdiction of the Superior Court would eventually be challenged. Given the convenience of the forum to the mother and its inconvenience to the father, counsel had no reason to anticipate that such an issue would be raised. The father therefore had no occasion to pursue or present the kind of evidence upon which he would have concentrated if jurisdiction had been a contested issue. The mother likewise failed to make any cohesive record on what she now presents to us as a jurisdictional issue. As a result, she largely relies in her brief on allegedly “undisputed facts” for which no record support is cited and for which it may be that none exists. The appeal therefore comes to us on a record which contains sparse information suggesting any meaningful New York connections. If we were now to reverse the judgment, as the mother suggests, we would surely be required to allow the father to develop an evidentiary record in the trial court, and the mother would receive a brand new opportunity to make a factual presentation which she could have made, but did not make, in the initial proceedings.[9]
The kind of barristerial about-face which characterizes this case finds little favor in the courts. In general, a party may not assert one theory in the trial court and a contrary one on appeal. See, e.g., District of Columbia v. Wical Ltd. Partnership, 630 A.2d 174, 182 (D.C.1993); D.D. v. M.T., 550 A.2d 37, 48 (D.C.1988). As Judge Spotts-wood Robinson wrote so eloquently for the court in Miller v. Avirom, 127 U.S.App.D.C. 367, 369-70, 384 F.2d 319, 321-22 (1967),
[i]n our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort. Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party’s thesis, will normally be spurned on appeal. Canons of this tenor reflect, not obeisance to ritual, but considerations of fairness to the court and the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact.
See also Wical, supra, 630 A.2d at 182; D.D. v. M.T., supra, 550 A.2d at 48.
We recognize that, as a general rule, subject matter jurisdiction may not be waived, Super.Ct.Civ.R. 12(h)(3), and that when it affirmatively appears that such jurisdiction is lacking, an objection may be raised by the parties or by the court for the first time on appeal. King v. Kidd, Nos. 90-CV-1621, 91-CV-283, 1993 WL 326062 (slip op. at 9-10) (D.C. Aug. 26, 1993); In re Estate of Dapolito, 331 A.2d 327, 328 (D.C.1975); see also Customers Parking, Inc. v. District of Columbia, 562 A.2d 651, 654 (D.C.1989). But as the court recognized in Stewart v. United States, 199 F.2d 517 (7th Cir.1952) — a case in which subject matter jurisdiction was at issue — “[t]he word ‘jurisdiction’ is an [ejlusive and uncertain characterization, depending on the environment in which it is employed.” Id. at 519. A consideration of the “environment” in which the jurisdictional issue arises in this case persuades us that the mother’s objections to the trial court’s authority may be (and here have been) waived, and that it would be inequitable to permit her to raise them for the first time on appeal.
The purported lack of subject matter jurisdiction based on territorial considerations — a fair characterization of the asserted defect here — has been held to be analytically similar to improper venue; it does not go to the poiver of the court to adjudicate the case, and may be waived if not asserted in timely *79 fashion. People v. Jackson, 150 Cal.App.3d Supp. 1, 198 Cal.Rptr. 135, 138-43 (1983) (opinion contains in-depth analysis); see also Lacks v. Lacks, 41 N.Y.2d 71, 390 N.Y.S.2d 875, 876-78, 359 N.E.2d 384, 386-88 (1976); Restatement (Second) of Judgments § 11, comment (b), at 109 (1982). Accordingly, as the Supreme Court of Indiana recently held in an analogous UCCJA case, territorial jurisdiction is waivable; in fact, any challenge on that ground must be raised at the outset of the action. Williams v. Williams, 555 N.E.2d 142, 143 (Ind.1990). “Once a court possesses subject matter jurisdiction to consider the general class or kind of case, its specific jurisdiction over a particular case within the general class is subject to waiver.” Id. at 144.
Williams is remarkably similar to the present case. There, the parents were married in Illinois. After the parties separated, the mother remained in Illinois with their son, while the father moved to Indiana with their daughter. The father obtained a divorce in Illinois, but no custody issues were resolved. Later, the mother filed suit in Indiana to resolve issues of custody, support, and visitation as to both children. Both parties consented to the court’s jurisdiction. After the hearing, the court granted custody of both children to the father. On appeal, the mother changed course, and now claimed that because the son’s home state was Illinois (where he lived with her), the Indiana court had lacked jurisdiction under the UCCJA to determine custody as to him. The court of appeals agreed with the mother, but the Indiana Supreme Court reversed:
The jurisdictional limitations imposed by the UCCJA are not equivalent to declarations of subject matter jurisdiction, but rather are refinements of the ancillary capacity of a trial court to exercise authority over a particular case. This exercise of authority is waivable.
Because of the voluntary conduct of [the mother] in affirmatively engaging the Indiana courts to determine custody, and expressly consenting to the trial court’s authority to determine custody, we find that she has waived any question regarding the authority of the court to decide the issue of custody under the facts of her case and has thus waived [any objection to] the trial court’s jurisdiction over her particular case.
555 N.E.2d at 145 (internal citations omitted).
The same principles apply here; the mother waived any territorial limitation on the Superior Court’s jurisdiction to firm up the parents’ visitation schedules for both children and to modify the separation agreement with respect to the custodial parent’s authority over substantial medical decisions affecting each child.
We agree with the reasoning of the court in Williams. Questions of jurisdiction under the PKPA and UCCJA are highly context-sensitive, and often turn on difficult judgment calls, such as whether it is “in the best interest of the child” that a court of a State assume jurisdiction, see PKPA § 1738A(e) (2) (B )(ii), or whether the District “is the more appropriate forum to determine the custody of the child,” see UCCJA § 16-4503(a)(4)(A). These are often issues on which reasonable people may differ, and they cannot be resolved in a vacuum. Rather, they must be decided on the basis of a record developed in the trial court. A party is surely not entitled, as we have explained, to more than one bite at the apple in making that record.
Uncritical application of the “no waiver of subject matter jurisdiction” rule to the sort of situation presented here would also permit a litigant to contest the merits of a controversy in a convenient forum, exult in victory if she wins, but keep the jurisdictional card in her hip pocket, to be produced only in the event that she loses. See Palmer Constr. Co. v. Patouillet, 42 A.2d 273, 274 (D.C.1945); (“[o]ne cannot take [her] chance on a favorable [decision], reserving a right to impeach it if it happens to go the other way”); accord Hunter v. United States, 606 A.2d 139, 144 (D.C.1992) cert. denied, — U.S. -, 113 S.Ct. 509, 121 L.Ed.2d 444. “Enormous confusion and interminable delay would result if counsel were permitted to appeal upon points not presented to the court below.” Johnston v. Reily, 82 U.S.App.D.C. 6, 7, 160 F.2d 249, 250 (1947). To permit a party who litigated the issues more or less in her own back yard to challenge the court’s territorial jurisdiction for the first time on appeal would invite such *80 confusion and delay, a result which we are not prepared to countenance.[10] Accordingly, the order appealed from is hereby

Affirmed.

[11]

. The separation agreement describes the mother as a resident of New York.

. On cross-examination, the father testified as follows:
Q. The visitation just before Christmas in 1988, I think you testified that Ms. P told you to return Jennifer at 4:30 that afternoon, correct?
A. Correct.
Q. In fact, you didn’t return her until 8:30 that evening?
A. To the best of my knowledge, it was 6:30. It could have been 8:30.
Q. You're aware of the fact that Ms. P was hysterical and called the New Jersey State Police three times? Are you aware of that?
A. I have no evidence to that effect.
Q. In fact, she called your telephone answering machine and left numerous messages, isn’t that correct?
A. Yes, numerous messages.
Q. In fact, you knew she was worried about where Jennifer was, correct?
A. She was, I guess, worried about Jennifer.
Q. But you didn’t return any of those telephone calls?
A. Correct.
Q. In fact, Jennifer was sitting in the room and knew that her mother had called — heard her mother's voice on the tape, correct?
A. Correct.

. In addition, the father began numerous letters to the mother with the salutation "Dear Bertha." It appears that although Bertha is in fact the mother’s first name, she detests being so addressed. The father professed ignorance as to dle mother’s feelings and as to what his son knew or did not know:
Q. So you, in every single one of these letters, refer to her as "Dear Bertha”?
A. Which is certainly her name.
Q. Knowing that it annoys her immensely?
A. I can't speak for what she feels.
Q. You don't know whether she was annoyed by that name. Isn't it a fact that you refer to her as Bertha to her children who did not know her by that name at all?
A. Joshua is aware of the fact that her name is Bertha.
Q. Joshua is also aware of the fact that she’s known to everyone in the world as Jackie, correct?
A. I can't speak for what Joshua is aware of.
Q. She was always called Jackie all the years he lived with his mother, isn’t that correct?
A. There were some people that called her Bertha.
Without making a specific finding as to the credibility of this testimony, and the father’s apparently selective knowledge of Joshua’s awareness, the motions judge included in his written order a direction that the father not call the mother Bertha in front of their children. The mother’s counsel had plausibly argued that the father’s use of the mother’s detested first name tended to exacerbate the tensions between the parties and thus to impede, rather than facilitate, an amicable resolution of their differences.

. Counsel for the father represented to the motions judge that, prior to instituting proceedings in the District, the father had unsuccessfully applied for relief in New Jersey. The mother’s attorney made no response, and the record provides no further information on the subject.

. For example, in demanding that the father’s civil contempt motion be denied on the merits, the mother’s counsel stated that "it should be withdrawn with prejudice because the court does certainly have jurisdiction to litigate these claims.”

. We have been advised that the mother moved to New York a few months after the motions judge's oral decision.

. Jennifer lived with her mother in the District at the time the trial court decided the case, and the mother's argument that the Superior Court lacked jurisdiction is patently frivolous as to Jennifer. Joshua’s connections with the District are more tenuous, and a more substantial question would be raised if the mother had challenged, in timely fashion, the Superior Court’s jurisdiction as to him. We need not decide whether these connections were insufficient to support jurisdiction under the PKPA and the UCCJA, however, because as we show below, the mother has waived the issue. We also note in passing the mother’s acknowledgment in her brief that
[t]he children’s best interests cannot properly be addressed in separate forums. In order to accomplish this goal, one court must address both children's situations.

.The mother argues that the New York courts constitute the proper forum for both children. Since two of the individuals principally affected by this litigation lived in the District during the relevant period, since the other two lived in New Jersey, since none of them lived in New York, *78 and since both parties sought relief in the Superi- or Court, we find this contention altogether unpersuasive. See also Beddow v. Beddow, 162 A.D.2d 598, 556 N.Y.S.2d 780, 781 (2d Dept. 1990) (New York courts do not exercise "significant connection” jurisdiction where a new "home state” has been established).

. Even today, the mother has not made any persuasive proffer that would suggest that the Superior Court lacked jurisdiction.

. The husband's counsel did not argue in his brief that the wife waived her jurisdictional contentions by failing to raise them in the trial court. As we recently recognized in Outlaw v. United States, 632 A.2d 408, 410 n. 7 (D.C.1993), however, a court may consider a dispositive issue even if the parties have failed to identify or brief it. Here, the issue whether the mother had adequately preserved her jurisdictional contentions was unequivocally raised by the court, sua sponte, at oral argument, but the mother’s attorney has not requested leave to file a supplemental submission. We perceive no unfairness in basing our decision upon a ground which counsel did not brief, but which they ought to have anticipated. Cf. Sheetz v. District of Columbia, 629 A.2d 515, 519 (D.C.1993); Sebastian v. District of Columbia, 636 A.2d 958, 959 n. 2 (D.C.1994).

. The other contentions raised by the mother are unpersuasive. The modification of the New York decree effected by the judge when he ordered a visitation schedule was not an abuse of discretion, for there was ample evidence of changed circumstances. See Rice v. Rice, 415 A.2d 1378, 1383 (D.C.1980). After the divorce decree was entered, the situation changed materially and unexpectedly, for the father and mother were no longer able to "mutually agree” with respect to visitation arrangements. Moreover, both parties had requested that the court order a schedule of visitation.
The mother also complains that she had no notice that the court would consider modifying the parties’ rights and obligations concerning medical decisions about the children, and, alternatively, that there was no basis in the record for the modification that was ordered. We disagree. The mother having filed a pleading requesting modification of the order as to visitation, and having testified extensively in support of her own motion regarding the operation of the original decree with respect to medical decisions, she is in no position to complain on appeal when the judge dealt with a problem which she had presented to him. This portion of the judge’s order was designed largely to respond to the mother’s legitimate grievance regarding the father’s conduct in relation to Joshua’s surgery. See page 76, supra. It was supported by the evidence and reasonably calculated to promote the children’s welfare. See Rice, supra, 415 A.2d at 1383.
The mother further faults the judge for allegedly failing to make written findings of fact and conclusions of law. The proceeding before the motions judge, however, constituted a hearing on the parties’ cross-motions, not a trial, and the requirements of Super.Ct. Dom.Rel.R. 52(a) were not implicated. In any event, these requirements are not jurisdictional. Hurwitz v. Hurwitz, 78 U.S.App.D.C. 66, 69, 136 F.2d 796, 799 (1943). Moreover, the mother can point to no prejudice and claims none.
Finally, the mother points out that the father initially registered the New York decree pursuant to the Uniform Reciprocal Enforcement Support Act (URESA), D.C.Code § 30-301 et seq. (1988), rather than under the PKPA or UCCJA. Since the father subsequently filed a motion for civil contempt and supplemental relief and invoked rights cognizable under the PKPA and UCCJA, and since the mother cross-moved for visitation, this contention is not persuasive.