**Frank DURPHY, Elizabeth Durphy, Appellants,**

v.

**KAISER FOUNDATION HEALTH PLAN OF MID–ATLANTIC STATES, INC., Appellee.**

**Nos. 94–CV–851, 94–CV–1136.**

District of Columbia Court of Appeals.

Argued April 22, 1996.

Decided July 31, 1997.

Lawrence S. Lapidus, Washington, DC, with whom Anthony G. Newman, and Jack A. Gold, Bethesda, MD, were on the brief, for appellants.

Alfred F. Belcuore, with whom Joseph Montedonico, and Scott D. Austin, Washington, DC, were on the brief, for appellee.

Before WAGNER, Chief Judge and SCHWELB and KING, Associate Judges.

WAGNER, Chief Judge.

Appellants, Frank Durphy and his wife, Elizabeth Durphy, filed a medical malpractice action against Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc. (Kaiser) alleging that Kaiser's physician employees negligently failed to diagnose timely and treat properly Mr. Durphy's osteomyelitis, a bone infection, as the result of which Mr. Durphy's right foot had to be amputated. Mrs. Durphy sued for loss of consortium resulting from Kaiser's negligence. Kaiser denied the allegations of negligence and contended that any injuries and damages sustained by Mr. Durphy resulted from his own contributory negligence in failing to comply with conditions essential for the care of his diabetic condition. The jury returned a ver-

dict for the Durphys in the amount of $2 million.

Kaiser filed a motion for judgment notwithstanding the verdict, contending that the evidence established as a matter of law that Mr. Durphy's contributory negligence was a proximate cause of the loss of his foot. Alternatively, Kaiser requested a new trial or remittitur on the grounds that: (1) the verdict was against the weight of the evidence; (2) the verdict was excessive; and (3) the trial court failed to address adequately Kaiser's claim that the Durphys exercised their peremptory challenges in a discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Concluding that the evidence showed that Mr. Durphy was contributorily negligent as a matter of law, the trial court granted Kaiser's motion for judgment notwithstanding the verdict. The court granted Kaiser's motion for a new trial on the alternative ground that the verdict was "clearly against the overwhelming weight of the evidence" and that it had failed to address adequately Kaiser's *Batson* challenge.

The Durphys argue on appeal that: (1) the evidence raised a jury question on contributory negligence and whether any such negligence proximately caused Mr. Durphy's injury; (2) the trial court abused its discretion in granting a new trial because there was ample evidence that Mr. Durphy's contributory negligence, if any, was not related causally to the loss of his foot; and (3) the trial court erred in granting a new trial based upon its review of the *Batson* issue because Kaiser failed to meet its burden in the first instance and failed to preserve the issue for purposes of its motion for new trial. We hold that the trial court erred in granting Kaiser's motions, and reverse and remand for reinstatement of the jury's verdict and further proceedings consistent with this opinion.

## I. *Factual Background*

At the time relevant to this case, Mr. Durphy was a forty year old patient of Kai-

ser's health care plan and had been since 1978. In 1985 he was diagnosed with diabetes. Mr. Durphy testified that on March 24, 1988, he was seen by Dr. Anthony Boakye, an internist at Kaiser's North Capitol Street facility. At that time, he complained to Dr. Boakye of severe pain in his right foot, which he thought was broken, and requested an x-ray. Dr. Boakye noted swelling in Mr. Durphy's leg, but he concluded that his pain was caused by venous insufficiency, and he did not arrange for an x-ray.[1] The Durphys' medical expert, Dr. Robert Tanenberg, a board-certified internist and endocrinologist, testified that Dr. Boakye's failure to order an x-ray to determine Mr. Durphy's condition, given the patient's symptoms and medical history, breached the standard of care.

It was not until August 1988 that an x-ray of Mr. Durphy's foot was taken at Kaiser. The x-ray showed that Mr. Durphy had a condition known as Charcot foot, which involves destruction of the bones due to nerve damage. The x-ray report also indicated that osteomyelitis, an infection in the bone, should be ruled out. Another x-ray was taken on September 4, 1988 which indicated that Mr. Durphy had a "superimposed infection," and the radiologist recommended a bone scan to address her concern that osteomyelitis might be present. Between September 4 and September 23, 1988, Kaiser's physicians examined Mr. Durphy on seven separate occasions. Mr. Durphy testified that he returned to the clinic so frequently because he was in constant pain and experiencing fever and headaches, and his condition was not improving.

Dr. Lya Karm, an internist employed by Kaiser, testified that she examined Mr. Durphy on September 6, 1988 and that she diagnosed his condition as cellulitis, an infection of the soft tissue, although she was concerned that he might have osteomyelitis.[2] Dr. Karm recommended that Mr. Durphy see a podiatric surgeon to debride or cut away the dead tissue around the infected

---

1. Dr. Boakye explained that venous insufficiency or venous stasis is the cooling of the blood in the legs because of defective veins.

2. There was testimony by Dr. Rabin that cellulitis, a soft tissue infection, may lead to penetration of the infected bacteria into the bone causing an infection in the bone, which is osteomyelitis.

area of his foot in order to determine whether the infection had entered the bone. Although Mr. Durphy complied with this instruction, Dr. Karm did not obtain the results of the procedure from the podiatrist who performed it. Dr. Karm also testified that at the time she saw Mr. Durphy in September, she did not have the x-ray report from the examination two days earlier or his medical records of his intervening treatment since she last examined him in July 1988. Dr. Martin Raff, the Durphys' infectious disease expert, testified that the standard of care required immediate hospitalization at that time instead of continued outpatient treatment with oral antibiotics.

On September 24, 1988, suffering from swelling, drainage, chills and fever, Mr. Durphy went to Washington Adventist Hospital where he was admitted and remained for a five-day stay, during which he was under the care of Kaiser's physicians. He was treated with intravenous antibiotics and released on September 28, 1988. However, there was expert testimony that the standard of care required four to six weeks of intravenous antibiotic treatment to prevent the infection from advancing, not just five days. One of the Durphys' physicians, Dr. Rabin, testified that if the four to six week intravenous antibiotic treatment had been provided, Mr. Durphy's osteomyelitis could have been cured and his foot could have been saved. Both Dr. Raff and Kaiser's expert, Dr. Robert Ratner, testified that the applicable standard of care required four to six weeks of antibiotic treatment. Dr. Rabin further testified that Kaiser's failure to comply with that standard of care proximately caused the loss of Mr. Durphy's foot.

There was evidence that one of Kaiser's physicians ordered a bone scan when Mr. Durphy entered Washington Adventist Hospital, but one of Kaiser's other doctors cancelled it. Dr. Rabin stated that an x-ray report dated October 15, 1988 recommended that Mr. Durphy have a bone scan to determine the presence of osteomyelitis, but no bone scan was taken at that time or at any time before January 1989 when Mr. Durphy's

foot was amputated. Dr. Rabin testified that Kaiser's failure to perform a bone scan to determine the presence of osteomyelitis was a breach of the standard of care and a substantial factor causing the loss of Mr. Durphy's foot. Dr. Robert Tanenberg testified that the failure to perform a bone scan was a substantial factor in causing Mr. Durphy to lose his foot because it delayed treatment, and the delay was critical. Both Drs. Rabin and Tanenberg testified that osteomyelitis was present by September 1988 and that Kaiser's failure to treat it in accordance with the standard of care between that time and early November 1988 proximately caused the amputation of Mr. Durphy's foot.

On November 1, 1988, Mr. Durphy was seen by Dr. Stephen Shapiro, an orthopedic surgeon with Kaiser, who testified that Mr. Durphy had a large ulcer on his foot, about three centimeters in diameter, but that it was not infected. Dr. Shapiro testified that he placed a "total contact" cast on Mr. Durphy to redistribute the weight in order to allow the ulcer to heal. Dr. Shapiro testified that he discussed with Mr. Durphy the seriousness of his condition, explaining that if the cast did not work, surgery might be required and that he might lose his foot. Mr. Durphy testified that no one explained that to him. Dr. Shapiro admitted that casting does not cure osteomyelitis once the bone becomes infected. Dr. Shapiro examined Mr. Durphy a week later, on November 8, 1988, and determined that the ulcer was getting better and had decreased by two-thirds its previous size. However, Dr. Rabin testified that since Mr. Durphy was on some degree of antibiotics, it tended to suppress the infection which made him appear better when Dr. Shapiro saw him. Dr. Rabin testified that the inadequate dosages of antibiotics taken orally, as prescribed for Mr. Durphy, might slow the progression of the disease, but it would not cure it.[3]

Dr. Shapiro testified that he wanted to put another cast on Mr. Durphy, but Mr. Durphy would not allow it. According to Dr. Shapiro, Mr. Durphy attributed his resistance to business reasons or how his customers would

---

3. Dr. Rabin explained that "it would be like putting sand on top of a fire to kind of damp it

down … slow it down. But it isn't going to stop the fire."

perceive him. However, Mr. Durphy testified that he did not permit Dr. Shapiro to replace the cast on November 8, 1988, because his foot had been bleeding and dripping inside the cast and had not improved. Mr. Durphy promised to return in two days to have the cast reapplied, but never returned. Mr. Durphy testified that he did not believe he was being treated properly. Mr. Durphy did not see Kaiser's doctors again until January 1989, explaining that he had been suffering since March 1988 and that the doctors did not seem to be doing anything for him, which caused him to lose confidence in them.

Mr. Durphy was admitted to Holy Cross Hospital in January 1989. According to Dr. Ratner, at that time Mr. Durphy had a "very, very similar recurring episode" as compared with the symptoms which he experienced in September 1988. An infectious disease specialist was consulted, and a bone scan confirmed that Mr. Durphy had osteomyelitis. At that time, Mr. Durphy's right foot was amputated. Dr. Shapiro testified that he examined Mr. Durphy at Holy Cross Hospital on January 24, 1989 and that Mr. Durphy had cellulitis. He said that it was clear from the severity of the infection that Mr. Durphy also had an infection in the bone. Dr. Shapiro ordered the bone scan to determine whether the infection had spread to other bones in his foot or to the ankle. He testified that whether osteomyelitis is present or not, the failure to wear a cast can exacerbate the condition and cause the infected bone to become unsalvageable. Both Dr. Shapiro and Dr. Rabin agreed that the patient required antibiotics.

It was Kaiser's theory that Mr. Durphy was contributorily negligent in that he failed to cooperate in his treatment. Kaiser introduced evidence that Mr. Durphy missed appointments both before and after the amputation of his foot. Kaiser also presented evidence that Mr. Durphy failed to maintain a diabetic diet, follow the advice of his doctors to take his medicine, wear protective coverings for his feet, and be hospitalized when recommended. Kaiser's experts opined that Mr. Durphy's conduct proximately caused the onset and progression of his osteomyelitis which resulted in the loss of his foot. Kaiser contended that Mr. Durphy's foot was still salvageable in November 1988 and that his failure to continue treatment until January 1989, knowing the risks, was contributorily negligent. Dr. Shapiro testified that Mr. Durphy did not have either cellulitis or osteomyelitis on November 1 or November 8. Kaiser's expert, Dr. Cheatham testified that if Mr. Durphy had continued with the ongoing treatment, he would not have had to undergo the amputation. However, he also testified that assuming that osteomyelitis was present, wearing a cast and special shoes and maintaining a special diet would not cure it or arrest its progression.

All the medical experts agreed that Mr. Durphy's non-compliance was irrelevant if the osteomyelitis was present before November 1988 because none of the treatment Kaiser prescribed up to that time would have cured the osteomyelitis. They also agreed that, without treatment, the osteomyelitis would inevitably lead to amputation or death. Mr. Durphy's experts, Dr. Jack Rabin and Dr. Robert Tanenberg, both opined that Mr. Durphy contracted acute osteomyelitis in September 1988 and that once the disease was present, the only cure was treatment for four to six weeks with intravenous antibiotics. There was also evidence that Mr. Durphy sought treatment from Kaiser's doctors approximately twenty-one times between March 1988 and November 1988. This included a hospital stay from September 24–28, 1988.

## II. *Judgment As a Matter of Law*

The Durphys argue that the trial court erred in granting Kaiser's motion for judgment notwithstanding the jury's verdict based upon its finding that Mr. Durphy was contributorily negligent as a matter of law. They contend that they presented sufficient evidence from which the jury could conclude reasonably that any conduct on Mr. Durphy's part was not a proximate cause of his injuries and that his conduct was not objectively unreasonable under the circumstances. Kaiser argues that the Durphys failed to present sufficient evidence that Mr. Durphy's conduct was not a substantial factor contributing

to his injuries and damages.[4] Kaiser contends that the evidence showed that Mr. Durphy was aware of his condition and that the risk of non-compliance with Kaiser's treatment plan, while failing to obtain alternative medical advice, amounts to contributory negligence which bars recovery. Before considering these arguments, we review various legal principles which govern their disposition.

### A. Standard of Review

A judgment notwithstanding the verdict of the jury is appropriate only where " 'no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.' " *Lyons v. Barrazotto*, 667 A.2d 314, 320 (D.C.1995) quoting *Oxendine v. Merrell Dow Pharm., Inc.*, 506 A.2d 1100, 1103 (D.C. 1986) (citing *District of Columbia v. Cooper*, 445 A.2d 652, 655 (D.C.1982) (en banc) and *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 669 (D.C.1983)). When the case turns on disputed factual issues and credibility determinations, the case is for the jury to decide. *Lyons*, 667 A.2d at 320 (citing *Washington Welfare Ass'n, Inc. v. Poindexter*, 479 A.2d 313, 315 (D.C.1984)) (quoting *District of Columbia v. Gandy*, 450 A.2d 896, 900 (D.C.1982), *modified on other grounds*, 458 A.2d 414 (D.C.1983)). "If reasonable persons might differ, the issue should be submitted to the jury." *Id.* (citing *Lewis*, 463 A.2d at 669). In reviewing a motion for judgment as a matter of law after a jury verdict, this court applies the same standard as the trial court. *Oxendine*, 506 A.2d at 1103. Applying that standard, we conclude that this is not one of those extreme cases in which contributory negligence could be found as a matter of law. *See id.; Tilghman v. Johnson*, 513 A.2d 1350, 1351 (D.C.1986).

### B. Contributory Negligence

To establish contributory negligence, the party asserting the defense must prove by a preponderance of the evidence that the opposing party's negligence was a substantial factor in causing his or her injury, and that the injury or damage was either a direct result or a reasonably probable consequence of the negligent act or omission. *George Washington Univ. v. Waas*, 648 A.2d 178, 180 (D.C.1994) (citations omitted). "[C]ontributory negligence is 'unreasonable conduct,' *i.e.*, 'conduct "which falls below the standard to which a plaintiff should conform for his [or her] own protection" and contributes to the plaintiff's injury.' " *District of Columbia v. Mitchell*, 533 A.2d 629, 639 (D.C. 1987) (quoting *Scoggins v. Jude*, 419 A.2d 999, 1004 (D.C.1980) (citation omitted)). "[T]he standard of care for contributory negligence is the degree of care a reasonable person would take for his or her *own* safety." *District of Columbia v. Brown*, 589 A.2d 384, 389 n. 1 (D.C.1991) (citing RESTATEMENT (SECOND) OF TORTS § 466, comment f (1965); *Mitchell*, 533 A.2d at 639). In the context of a medical negligence case, the physician's superior knowledge and expertise in the subject area and the generally limited knowledge of the patient concerning the dangers associated with the illness and treatment may negate the critical elements of the defense of contributory negligence, specifically the knowledge and appreciation of the risks and dangers associated with certain medical treatments. *Morrison v. MacNamara*, 407 A.2d 555, 567 & n. 11 (D.C.1979). Therefore, the physician generally owes to the patient a greater duty than the patient owes to himself or herself. *Id.* at 568.

### C. Review of the Trial Court's Ruling

The trial court ruled that Mr. Durphy was contributorily negligent as a matter of law, concluding:

> [Kaiser] established by expert testimony that Mr. Durphy was contributorily negligent and that his negligence was a substantial factor in causing the amputation of his foot. Because this evidence was unrebutted by contrary expert testimony, no jury question was presented. [Mr. Durphy], therefore, was contributorily negligent as a matter of law and [Kaiser] is

---

4. On appeal, the Durphys contend that the trial court improperly held that expert testimony was necessary to rebut Kaiser's evidence of contributory negligence. Kaiser contends that the trial court did not so hold, and that in any event, that is not Kaiser's contention on appeal.

entitled to judgment notwithstanding the verdict.

In reaching its conclusion, the trial court focused on Mr. Durphy's reported conduct beginning November 1, 1988, which the court described as the beginning of the sequence of events at "[t]he heart of [Kaiser's] contributory negligence claim." This was the period when Dr. Shapiro, having failed to diagnose Mr. Durphy's condition as osteomyelitis, treated the ulcer on his foot with a cast to remove the pressure. The court relied upon evidence that after Dr. Shapiro applied the cast, Mr. Durphy's ulcer improved between November 1st and 8th and that Dr. Ratner testified that Mr. Durphy's refusal to wear the cast thereafter was a substantial factor contributing to the amputation. This evidence, the court found, was rebutted only by the testimony of Dr. Rabin to the effect that Mr. Durphy's missed appointments did not have anything to do with the infection or the loss of his foot, which the court deemed to be insufficient.

There was, however, other substantial evidence that Mr. Durphy had to undergo the amputation of his foot because of Kaiser's failure to diagnose and treat him for osteomyelitis prior to November 1988 when he could have been cured without amputation of his foot. Dr. Wayman Chetham, one of Kaiser's witnesses, testified that, assuming that Mr. Durphy had osteomyelitis in September 22, 1988, he would not have been cured, or the progression of his illness would not have been changed by maintaining a diet for diabetics, wearing a cast, special shoes or medicine. There was expert testimony and other evidence that Mr. Durphy indeed had osteomyelitis by September 1988. Dr. Rabin testified that osteomyelitis was present on August 28, 1988 in an early stage when it was treatable by medication rather than by surgery. An x-ray report of August 28th reflected that osteomyelitis could not be excluded as a diagnosis. It was Dr. Rabin's opinion that Kaiser's failure to treat Mr. Durphy's condition in September, October and early November 1988 with intravenous antibiotics for a minimum of four weeks, in accordance with the standard of care, proximately caused the deterioration of his acute condition to chronic, with the resultant need for surgical removal of his foot to cure his illness.

Dr. Tanenberg also testified that Mr. Durphy's osteomyelitis started in September of 1988. It was his expert opinion that Kaiser's failure to order a bone scan and to treat Mr. Durphy for a four-week period with intravenous antibiotics proximately caused the development of his acute condition, its progression to chronic osteomyelitis, with the resultant loss of his foot. It was his opinion that the cast could not cure the osteomyelitis or bone infection. Both Dr. Rabin and Dr. Tanenberg also testified that once osteomyelitis was present, the course of treatment Kaiser provided, a four-day hospital stay, oral antibiotics and a cast, were ineffective in treating the disease and led to the amputation of Mr. Durphy's foot.

■ Such evidence, if believed by the jury, was sufficient to allow the jury to determine that it was Kaiser's failure to treat Mr. Durphy's condition before early November 1988 which proximately caused the amputation of his foot, rather than any negligent acts or omissions by Mr. Durphy in failing to comply with treatment thereafter. Contributory negligence bars a plaintiff's recovery only if the plaintiff's injury or damage " 'was either a direct result or a reasonably probable consequence of [plaintiff's own negligent] act or omission.' " *Waas, supra,* 648 A.2d at 180. Whether any negligence on Mr. Durphy's part proximately resulted in the amputation of his foot was the subject of conflicting evidence, requiring the jury to weigh it, draw reasonable inferences from it, and resolve the disputed issues. *See Aqui v. Isaac,* 342 A.2d 370, 372 (D.C.1975).

Kaiser contends that Mr. Durphy's contributory negligence was not temporally distinct from the claimed medical malpractice. It contends that Mr. Durphy's failure to care for himself properly caused his osteomyelitis to develop at the same time that Kaiser allegedly committed malpractice and that his failure to care for himself from November 1988 until January 1989 caused the osteomyelitis to spread. The Durphys contend that any conduct on Mr. Durphy's part which may have necessitated treatment is irrele-

vant in assessing Kaiser's liability for failing to diagnose and properly treat his condition thereafter.

■■■ "In medical malpractice cases ... contributory negligence is a valid defense if the patient's negligent act concurs with that of the physician and creates an unreasonable risk of improper medical treatment." *Weeda v. District of Columbia*, 521 A.2d 1156, 1167 (D.C.1987) (citations omitted). However, where "the patient's negligent act merely precedes that of the physician and provides the occasion for medical treatment, contributory negligence is not a permissible defense." *Id.* (citations omitted). Where that occurs, the doctor's negligent act is considered an intervening cause which does not bar the patient from recovering. *Id.* Moreover, "a patient's non-cooperation with the doctor's instructions *after* the doctor's alleged negligent act" and "subsequent negligence of the patient, which aggravates the injury primarily sustained at the hands of the physicians, does not discharge the [physician] from liability, but only goes in mitigation of damages." *Waas, supra*, 648 A.2d at 180.

The majority of courts appear to hold that contributory negligence for a patient's non-compliance with medical treatment decisions will bar recovery completely only if the patient's negligent acts are contemporaneous with the physician's negligent acts. *Waas, supra*, 648 A.2d at 180 (citations omitted). In those jurisdictions, when a physician's negligence causes injury, the patient's subsequent non-compliance with treatment will mitigate damages. *Id.* (citations omitted). Other courts hold that the strict simultaneity rule is not applicable in all factual contexts. *See, e.g., Chudson v. Ratra*, 76 Md.App. 753, 548 A.2d 172, 182 (1988). In *Chudson*, the court formulated the test to be "not simultaneity but whether the plaintiff's dereliction has significantly contributed to the injury for which he or she sues." *Id.* The claim in *Chudson* was that the physician failed to diagnose and treat the patient's cancer at a time when it was probably curable. Finding that there was evidence that the patient's failure to seek medical treatment did more than just exacerbate her condition, but that it precluded diagnosis and treatment when her

cancer was probably still curable, the *Chudson* court held that the evidence was sufficient to support a finding that the patient was contributorily negligent. 548 A.2d at 182.

■■■ We need not resolve here which approach is correct because under either, the issue of contributory negligence was properly submitted to the jury which returned a verdict supported by the evidence. Mr. Durphy sought treatment of his foot in March 1988. Any negligence on Mr. Durphy's part which occurred prior to March 1988 preceded Kaiser's negligence and did not constitute contributory negligence. *See Weeda, supra*, 521 A.2d at 1167; *see also Nelson v. McCreary*, 694 A.2d 897, 904–06 (D.C.1997). Mr. Durphy's theory at trial was that he developed osteomyelitis at least by September 1988, and in spite of the numerous times that he was treated by Kaiser's medical personnel, including one hospitalization, they failed to diagnose and treat his condition appropriately when it could be cured by the administration of intravenous antibiotics for four weeks, rather than by amputation of his foot. Thus, there was evidence that Kaiser's negligence which resulted in the amputation was essentially complete prior to November 8, 1988, the date after which Mr. Durphy failed to follow the essential treatment decisions or return to Kaiser for treatment for some two months. There was also evidence that compliance with the recommended regimen would have made no difference if the osteomyelitis was present in August or September 1988 because the only cure was extended treatments with intravenous antibiotics, which Kaiser failed to recommend. This evidence, if accepted by the jury, would not bar recovery based on contributory negligence under either the simultaneity approach or the *Chudson* approach. *See Waas, supra*, 648 A.2d at 181–82; *Chudson, supra*, 548 A.2d at 182. Based on these facts, the jury reasonably could have concluded that Mr. Durphy was not concurrently negligent because his non-cooperation before, during, or after November 8, 1988 did not proximately cause the amputation of his foot.

■■■ Mr. Durphy's testimony also provided evidence from which the jury could find

that he was not negligent, *i.e.*, conduct below the standard to which one should conform for his or her own protection. *See Mitchell, supra,* 533 A.2d at 639. The patient's limited knowledge may negate this critical element. *Morrison, supra,* 407 A.2d at 567 & n. 11. Mr. Durphy testified that Kaiser's doctors never discussed with him the seriousness of his condition, the results of his x-rays, the possibility that he might have osteomyelitis, that he required four to six weeks of intravenous antibiotic treatment, or that he might lose his foot if the infection was not effectively treated. He stated that he failed to keep some of the appointments with the doctors because of "the ineffectiveness of the doctors and not listening to me and my suffering." There was testimony from Dr. Rabin that the standard of care required the physicians to assume the burden of trying to educate the patient as to the serious nature of the illness and the treatment requirements. It was for the jury to resolve the factual conflict as to whether the physicians provided Mr. Durphy with the information necessary for him to assess the risks associated with his condition and whether his conduct was reasonable given the circumstances and what he knew. *See id.; District of Columbia v. Brown,* 589 A.2d 384, 389 (D.C.1991); *see also Weinstock v. Ott,* 444 N.E.2d 1227, 1240 (Ind.App.3d Dist. 1983) (patient's frustration with ineffective treatment can be considered by jury in determining whether patient acted reasonably in discharging herself from the hospital).

Moreover, there was substantial evidence that Mr. Durphy made a significant effort to be treated. In September, Mr. Durphy was treated by Kaiser's doctors fourteen times, including a visit to two doctors, an x-ray on September 4 and a hospital stay from September 24 through September 28, 1988. In October, he was treated four times by Kaiser, and he telephoned them October 14, 1988 to report that his foot was swollen. He saw Dr. Shapiro twice in November. According to the Durphys' experts, this was the critical period during which the failure to treat him irrevocably led to the amputation of his foot. The jury could fairly conclude from this evidence that Mr. Durphy did not fail to exercise the degree of care a reasonable person would take for his own safety, as Kaiser

contends. *See Brown, supra,* 589 A.2d at 389 n. 1. Given the substantial evidence that any negligence on Mr. Durphy's part did not proximately cause the loss of his foot, the trial court erred in finding as a matter of law that contributory negligence barred recovery.

### III. *New Trial*

#### A. *Weight of the Evidence*

The Durphys argue that the trial court erred in ruling alternatively that Kaiser was entitled to a new trial on the ground that the jury's verdict was against the "overwhelming weight of the evidence." Such a motion is committed to the trial court's discretion, and its ruling thereon will not be set aside absent an abuse of its discretion. *Oxendine, supra,* 506 A.2d at 1110 (citations omitted); *see also Washington v. A & H Garcias Trash Hauling Co.,* 584 A.2d 544, 545 (D.C.1990). However, a greater degree of scrutiny is required where the trial court grants a new trial on the basis that the jury's verdict is against the clear weight of the evidence in order "to assure that the trial court did not simply accept one version of the facts over another." *Lyons, supra,* 667 A.2d at 324–25 (citing *Felton v. Wagner,* 512 A.2d 291, 295 (D.C.1986) (footnote omitted)). " 'Such a close scrutiny is required in order to protect the litigants' right to jury trial.' " *Oxendine,* 506 A.2d at 1111 (citing *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 90 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).

The trial court's ruling granting a new trial is based essentially upon the same reasoning which it applied in finding contributory negligence as a matter of law and granting a judgment notwithstanding the jury's verdict. Relying upon Kaiser's evidence, the court found contributory negligence based upon Mr. Durphy's refusal to continue to wear a cast after November 8, 1988. It also faulted the Durphys for providing insufficient evidence to refute this claim. The jury could conclude properly, however, that the critical period occurred prior to November 8th when Kaiser failed to diagnose and properly treat Mr. Durphy's osteomyeli-

tis when it could have been treated with antibiotics instead of amputation and that the negligence, if any, of Mr. Durphy during that time did not contribute to the loss of his foot. There was substantial evidence supporting the Durphys' theory of the case and the jury's verdict, as the discussion in the preceding section of this opinion shows. The question whether a new trial should be ordered is committed to the trial court's discretion. *Fisher v. Best,* 661 A.2d 1095, 1098 (D.C.1995). However, the trial court may not "set the [jury] verdict aside as against the weight of the evidence merely because, if [it] had acted as trier of fact, [it] would have reached a different result." *Lyons, supra,* 667 A.2d at 325 (citing 6A MOORE'S FEDERAL PRACTICE ¶ 59–08[5], 59–148 (2d ed.1995)). It appears that is what occurred here. Therefore, we must reverse the trial court's ruling insofar as it is premised upon its finding as to the weight of the evidence.[5]

### B. *The Batson Ground*

██ The trial court also granted a new trial because it perceived that it had failed to address adequately Kaiser's *Batson* challenge. A new trial may be granted where " 'the trial was unfair, or there was a prejudicial legal error in the proceedings.' " *Lyons, supra,* 667 A.2d at 324 (citing *Bell v. Westinghouse Elec. Corp.,* 483 A.2d 324, 327 (D.C. 1984)). The Durphys contend that Kaiser failed to meet its burden on their *Batson* challenge, and therefore, the trial court abused its discretion in granting a new trial based upon its misapprehension that it had failed to address adequately the *Batson* claim.

We are hampered in any meaningful review because Kaiser's *Batson* challenge came after the court had excused the venire, and therefore their exact racial make-up cannot be determined from the record. *See Nelson v. United States,* 601 A.2d 582, 590 (D.C. 1991) (challenge on appeal rejected where the record was inadequate to establish the racial make-up of the venire or the jury actually selected). When Kaiser raised the issue, neither the court nor the two attorneys

appearing for the Durphys were able to recall the racial make-up of the venire. Indeed, the trial court stated when Kaiser made the challenge that it could not fully address the issue for that very reason and that neither the court nor opposing counsel were in a position to verify Kaiser's claim. Only counsel for Kaiser seemed to have noted the racial composition of the venire. The unfairness in the situation at that point was against the Durphys because of the untimeliness of Kaiser's challenge.

*Batson* claims must be raised seasonably. *Owens–Corning Fiberglas Corp. v. Henkel,* 689 A.2d 1224, 1227 (D.C.1997) (citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). Although the precise stage at which such challenges must be made was not determined in *Batson,* subsequent cases in this court and elsewhere reflect that such objections must be raised, generally, in time to allow meaningful and effective inquiry into the matter. *Owens–Corning,* 689 A.2d at 1227. In *Owens–Corning,* this court held that a party's failure to object until after the jury was sworn and opening statements made waived the *Batson* claim. *Id.* at 1227–28. Reasons of fairness and practicality dictate the court's insistence on timeliness for such claims. The party challenged will be hampered in his defense in having to reconstruct the array of the panel after the venire members have been released. *Id.* The court's ability to make an informed judgment about the claim or to take corrective action to remedy the situation is impeded when the challenge is asserted only after the venire panel has been excused. *Id.* At that point, neither the court nor opposing counsel may be able to remember specifically who was challenged, and the court cannot then re-seat any jurors who were stricken for improper reasons. *Id.*

In this case, Kaiser waited until the venire had been released and the jury was informed that it was the panel which would hear the case to raise its *Batson* claim. Although counsel for Kaiser indicated that this was his first opportunity to make the challenge, the record reflects otherwise. Both sides exer-

---

5. In light of its ruling on the new trial motion, the trial court did not address Kaiser's alternate request for remittitur. Therefore, upon remand, the issue remains for consideration.

cised their strikes at the bench after which the trial court stated that it would seat the first nine jurors remaining in the box. Kaiser could have, but did not raise any objection before the bench conference concluded, and the court finally seated the jury. Still Kaiser raised no objection, and the court excused the venire. Only after the venire was dismissed and the jury was seated and excused for lunch did Kaiser raise its *Batson* claim.

Recognizing the impediments to its fair consideration of the claim at that point, the trial court enumerated the difficulties presented by the belated challenge. In that connection, the trial court stated:

> You know, you're handicapping all of us by raising it after the jury panel is gone; they're out of the courtroom; none of us are in a position to sit here and verify the claim ... it doesn't give us the opportunity to look at the list and just evaluate the overall argument; compare it with the people sitting out in the courtroom. That's number one.
>
> Number two, it also deprives us entirely of the opportunity to try to repair it, if something needs to be repaired. So, you're handicapping me and I think the other side in addressing the issue, by presenting it in the fashion that you did; and secondly, having spent the morning trying to put a jury in the box and letting it go down this way—frankly it's frustrating not to be able to address it adequately, because of the timing and the fashion in which you made your point.

These are some of the same considerations which guided this court's decision in *Owens–Corning,* 689 A.2d at 1228.

 We held in *Owens–Corning* that a *Batson* challenge must be made before the jury is sworn. *Owens–Corning, supra,* 689 A.2d at 1228. Some of the circuits have gone

further and held that a *Batson* objection must be made before the venire is dismissed and the trial commences. *See, e.g., United States v. Parham,* 16 F.3d 844, 847 (8th Cir.1994); *United States v. Maseratti,* 1 F.3d 330, 335 (5th Cir.1993); *United States v. Romero–Reyna,* 867 F.2d 834, 837 (5th Cir. 1989), *cert. denied,* 494 U.S. 1084, 110 S.Ct. 1818, 108 L.Ed.2d 948 (1990); *see also Owens–Corning,* 689 A.2d at 1228 (stating that these decisions make "eminent sense"). We find these authorities persuasive in light of the reasons underlying the need for timely challenges in this area. We hold that where the record is clear, as it is here, that a challenge after dismissal of the venire prevents meaningful inquiry into the claim, impedes the defense to the motion, and forecloses corrective action by the trial court, the claim is properly rejected as untimely.

 In spite of its inability to explore adequately the *Batson* claim, the trial court attempted the inquiry. Without finding that Kaiser had made a *prima facie* showing, the court elicited the Durphys' race-neutral explanations for the strikes.[6] In spite of the court's efforts to obtain from Kaiser any comparisons with other jurors or other circumstances which would indicate that the explanations were pretextual, Kaiser offered none at the *Batson* hearing. Kaiser waited until after the verdict to attempt to impeach it with a belated rationale in support of its claim that the Durphys' explanations, offered prior to trial, were pretextual. *See Safeway Stores, Inc. v. Buckmon,* 652 A.2d 597, 603 (D.C.1994) (citing *B.J.P. v. R.W.P.,* 637 A.2d 74, 79 (D.C.1994) (argument may not be kept in litigant's "hip pocket, to be produced only in the event that [the litigant] loses")).[7] Kaiser simply did not adequately preserve the issues it sought to raise in its post-trial motion. *See id.*

---

**6.** A party making a *Batson* challenge (proponent) must make a *prima facie* showing that the party challenged (opponent) has exercised the strike on the basis of race before the burden shifts to the opponent to provide race-neutral reasons for the strike. *Batson, supra,* 476 U.S. at 96, 100, 106 S.Ct. at 1722–23, 1725; *Tursio v. United States,* 634 A.2d 1205, 1210 (D.C.1993); *Little v. United States,* 613 A.2d 880, 884–85 (D.C.1992). The

burden of proving purposeful discrimination rests with the party challenging the strike. *Purkett v. Elem,* 514 U.S. 765, 767–69, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995).

**7.** In *Buckmon,* having determined that the party making the challenge did not preserve the issue, we reviewed for plain error. 652 A.2d at 603.

In granting Kaiser's motion for new trial based on its post-trial *Batson* claim, the trial court concluded that it had not been rigorous enough in its scrutiny of the Durphys' peremptory strikes. Its failure to take that step in light of Kaiser's apparent abandonment of its effort to meet its burden under *Batson* and *Purkett, supra,* was not error. In any event, given the failure of Kaiser to make a timely challenge which would have allowed for the development of the record at trial, we are not persuaded that any error of law or interest of fairness warrants a new trial in this case.

In addition to the problems of timeliness, Kaiser never requested any relief at trial. Kaiser never asked that the court impanel a new jury, that the court seat any jurors who were excluded improperly or that the court exclude any persons who were improperly seated. Kaiser's actions simply were not sufficient to preserve the *Batson* issue. *See Buckmon, supra,* 652 A.2d at 603. Because Kaiser did not adequately preserve the *Batson* issue, we do not reach the merits of its claims.

For the foregoing reasons, the orders of the trial court entering judgment for Kaiser as a matter of law or alternatively granting a new trial are reversed, and the case is remanded for reinstatement of the jury's verdict in favor of the Durphys and further proceedings consistent with this opinion.[8]

*Reversed* and *remanded.*