**Deanne R. UPSON, Appellant,**

v.

**William E. WALLACE III, Appellee.**

**William E. Wallace III,
Appellant/Cross–
Appellee,**

v.

**Deanne R. Upson, Appellee/Cross–
Appellant.**

**and**

**In re Patrick G. Merkle, Appellant.**

Nos. 07–FM–572, 08–FM–435, 08–FM–436, 08–FM–1278, 08–FM–1279, 09–FM–1151, 09–FM–1620, 08–FM–450, 08–FM–555.

District of Columbia Court of Appeals.

Argued Jan. 26, 2010.
Decided Sept. 9, 2010.

---

Patrick G. Merkle, pro se.

William E. Wallace III, pro se.

Deanne Rose Upson, pro se.

Joanne L. Werdel, with whom Joan Meier and Leah Brannon, Washington, DC, were on the brief of Amicus Curiae Domestic Violence Legal Empowerment and Appeals Project in support of appellant Deanne R. Upson.

Before KRAMER and FISHER, Associate Judges, and KING, Senior Judge.

KING, Senior Judge:

These nine consolidated appeals and cross-appeal stem from protracted and contentious litigation surrounding the custody of Georgiana Rose Wallace, the daughter of William Wallace and Deanne Upson, who was born on May 30, 2004, in the Commonwealth of Virginia, nine months after her parents engaged in a brief intimate relationship. Because of the lengthy and confusing procedural history of this case, this opinion is divided into two sections, one dealing with the "D.C. Child Support Case," and the other dealing with the "Child Custody Proceedings in D.C. and Virginia." The central issues to be decided in this appeal are: (1) whether the District of Columbia had subject matter jurisdiction to adjudicate Upson's petition for child support under the Uniform Interstate Family Support Act; (2) whether the *pendente lite* child support order awarding Upson $4,000 per month was an abuse of discretion; (3) whether the trial court erred by dismissing Upson's 2007 Complaint for Custody in the District of Columbia for lack of subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act; and (4) whether Wallace, as a *pro se* attorney litigant, is entitled to receive an award of attorney's fees under Super. Ct. Dom. Rel. R. 11 or pursuant to the inherent power of the court. We affirm all of the challenged orders and judgments on appeal, except for the two that grant attorney's fees to Wallace.

## DISTRICT OF COLUMBIA CHILD SUPPORT CASE

### Facts and Procedural History

On August 16, 2004, less than three months after Georgiana's birth, Upson, while a resident of Virginia, initiated a child support proceeding through counsel in the District of Columbia, requesting child support, *pendente lite,* and permanent, sole legal custody of Georgiana,[1] and costs and attorney's fees (Case No. 2004 PCS 1375). The record reflects that Upson filed this case in the District of Columbia because she believed it was Wallace's place of residence.[2] Wallace filed his Answer to Upson's petition on September 22, 2004, and counter-claimed for custody, but later voluntarily dismissed his claim for custody. After a hearing in the matter, Magistrate Judge Pamela Diaz initially ordered Wallace to pay *pendente lite* month-

---

1. Upson later withdrew her request for custody of Georgiana within this support case.

2. In her petition for support, Upson stated that "Defendant is a bona fide resident and domiciliary of the District of Columbia, and has been for more than six months prior to the filing of this action."

ly child support on September 28, 2004 in the amount of $2,800 per month, retroactive to the birth of Georgiana, and then on November 22, 2004, modified the *pendente lite* support to $4,000 per month. Magistrate Judge Diaz also ordered that a $10,000 credit against any judgment of support be given to Wallace because he provided Upson with $10,000 while she was pregnant. On March 2, 2005, Wallace filed for custody of Georgiana in Alexandria, Virginia. Meanwhile, the record reflects that Upson and Georgiana relocated to the District of Columbia from Virginia around April of 2005.

On May 16, 2005, in the District of Columbia case, Wallace filed an "Amended Motion to Dismiss" Upson's petition for child support, arguing for the first time that the District of Columbia court did not have the jurisdiction to make a child support determination because neither he, Upson, nor the child, were residents of the District.[3] Magistrate Judge Diaz granted Wallace's motion to dismiss Upson's petition for child support on September 29, 2005, concluding that the court lacked subject matter jurisdiction to hear the matter and that it did "not have continuing, exclusive jurisdiction to enter any permanent child support order because the Commonwealth of Virginia is the Home state of the minor child pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act and the Uniform Interstate Family Support Act." Magistrate Judge Diaz stated that the *pendente lite* support order "shall continue in full force and effect" and that "this Court shall continue to exercise juris-diction with respect to any enforcement issues" until the *pendente lite* order was superseded by an order from the Virginia court.

On December 13, 2005, Superior Court Associate Judge Ronna Lee Beck vacated Magistrate Judge Diaz's September 29, 2005 order, stating that "the residency of the parties and the child, not the child's 'home state' were the relevant facts for the court to consider in this case when determining whether it had continuing exclusive jurisdiction."[4] The court noted that D.C.Code § 46–302.05(a) "provides that a court issuing a child support order consistent with the law of the District has continuing, exclusive jurisdiction as long as the District remains the residence of the obligator, the individual obligee, or the child."[5] The court remanded the case because the record lacked any findings of fact or conclusions of law on the residency of the parties. Associate Judge Beck noted that even if Wallace was no longer a resident of the District of Columbia, the court may still have jurisdiction under D.C.Code § 46–302.05(a) because the record indicated that Upson had moved to the District with Georgiana at some point in 2005. On remand, Magistrate Judge Diaz issued an order on May 23, 2006, finding that Upson "was a resident of the District of Columbia at the point in time the Respondent first raised the issue of subject matter jurisdiction" and that Wallace "has been a resident of the State of Maryland since March 23, 2004."[6] Accordingly, Magistrate Judge Diaz ordered Upson's petition for child support to be reinstated.

---

**3.** For the first time in this matter, Wallace claimed that he was a resident of Florida.

**4.** Under Super. Ct. Fam. R. D(e) (2010), an associate judge of the Superior Court, designated by the Chief Judge, may review an order or judgment of a magistrate judge upon motion by one of the parties. *See also* D.C.Code § 11–1732(k) (2001).

**5.** D.C.Code § 46–302.05(a) has since been amended on June 26, 2006 by D.C. Law 16–137.

**6.** Wallace represented that he was a resident of Maryland on remand.

Eight months later, on January 23, 2007, the *pendente lite* orders of September 28, 2004 and November 22, 2004 were suspended by Magistrate Judge Diana Epps, following a Virginia court's award of custody to Wallace[7] and evidence that Georgiana had begun to reside with Wallace instead of Upson. The court also concluded that "any and all other related matters to this case are beyond the jurisdiction of this Court and are hereby dismissed." On June 18, 2007, Upson filed a "Motion to Finalize Child Support" in the Superior Court and Wallace filed his response on July 6, 2007. After a hearing on August 2, 2007, Magistrate Judge Diana Epps issued an order on October 1, 2008, (1) denying Upson's requests for a retroactive modification of previously paid *pendente lite* support payments and a finalized support order for further payments, (2) denying Wallace's request for recoupment of previously made *pendente lite* support payments, and (3) dismissing the matter without prejudice. Magistrate Judge Epps concluded that D.C.Code § 46–204(c) precluded modification or recoupment of prior awards since there had been no support paid "for the period during which the petition for modification is pending." Further, she declined to order additional support absent a final custody order from Virginia, since "the duty of support follows custody."

Less than a year later, Upson again filed motions for support even though she no longer had custody of Georgiana. Magistrate Judge Dennis Doyle denied Upson's motion for emergency support on April 1, 2009, and her request for permanent support on May 5, 2009, because Upson "d[id] not have custody of the parties' minor child." Both Wallace and Upson requested review by a Superior Court Judge of the September 28, 2004 order (granting *pendente lite* support in the amount of $2,800 per month), the November 22, 2004 order (granting *pendente lite* support in the amount of $4,000 per month), and the May 5, 2009 order (denying Upson's most recent request for permanent support). Upson also requested review of the April 1, 2009 order (denying her emergency request for support).

■ Upon review of the Magistrate Judges' orders, Associate Judge Juliet McKenna issued an order on August 5, 2009, which, *inter alia*, (1) reversed and amended Magistrate Judge Diaz's September 28, 2004 order for *pendente lite* child support in the amount of $2,800 per month,[8] and instead ordered support consistent with the later $4,000 award, retroactive to Georgiana's birth; (2) affirmed Magistrate Judge Diaz's November 22, 2004 *pendente lite* order of child support in the amount of $4,000 per month; (3) affirmed Magistrate Judge Doyle's April 1, 2009 emergency order and his May 5, 2009 permanent support order because Upson no longer had custody of Georgiana; and (4) ordered the Office of Attorney General to conduct a complete audit of child support payments and recalculate the amount owed by Wallace to total $4,000 per month, from May 20, 2004 to January 23, 2007.[9]

7. The Circuit Court for the City of Alexandria issued a "Custody Decree" on December 22, 2006, granting Wallace sole legal and physical custody of Georgiana. The Circuit Court issued a "Final Order of Custody" to the same effect on March 1, 2007.

8. Associate Judge McKenna reversed the September 28, 2004 order because Magistrate Judge Diaz used her own salary as a bench-

mark to determine the amount of *pendente lite* support, instead of using evidence of the parties' income.

9. Associate Judge McKenna also issued an "Order Amending and Clarifying the August 5, 2009 Order," on September 17, 2009, which precluded Upson from submitting further filings with the Family Court with respect to Georgiana, unless accompanied by a

Associate Judge McKenna also concluded that Wallace filed his request for review of the May 5, 2009 order out of time, and therefore, the court was without jurisdiction to entertain his claims with respect to that order.[10] Both Upson and Wallace appealed to this court from Associate Judge McKenna's August 5, 2009 order (Appeal Nos. 09–FM–001151 & 09–FM–1620).[11]

## Challenge to the Subject Matter Jurisdiction of the District of Columbia to Adjudicate Child Support

■ We begin with the issue of subject matter jurisdiction, as it implicates the court's power to adjudicate child support in this matter. Wallace argues that the "District of Columbia did not have subject matter jurisdiction to adjudicate [Upson's] Petition for an original support order where neither the mother, the father nor the child were residing in the District of Columbia when the action was com-

menced." Wallace contends that Upson's support petition was properly dismissed by Magistrate Judge Diaz for lack of subject matter jurisdiction in her September 29, 2005 order, and therefore, Associate Judge Beck erred in her December 13, 2005 order vacating Magistrate Judge Diaz's order. Thus, Wallace argues, "each of the orders of *pendente lite* child support were erroneous as a matter of law." [12] Subject matter jurisdiction is a question of law, which we review *de novo. Keeton v. Wells Fargo Corp.*, 987 A.2d 1118, 1121 n. 5 (D.C.2010).

As an initial matter, we note the inconsistent, and often confusing, representations by Wallace as to his place of residence during this lengthy litigation. In his September 22, 2004 Answer to Upson's initial petition filed in the Superior Court on August 16, 2004, requesting child support, Wallace responded to Upson's statement of the District's jurisdiction by stating that he was "not required to admit or

certified order from this court or a Virginia appellate court.

10. Associate Judge McKenna did not determine whether Wallace had filed late requests for review of other orders. The Judge noted, however, that despite the jurisdictional bar, Wallace's claims lacked merit.

11. Wallace actually noted his appeal from Associate Judge McKenna's September 17, 2009 amended order. The September 17, 2009 order altered the August 5, 2009 order on an issue irrelevant to this appeal, so for all practical purposes, Wallace appeals from the August 5, 2009 order. Wallace also purports to appeal from Magistrate Judge Diaz's November 22, 2004 order (modifying the *pendente lite* support to $4,000 per month), Associate Judge Beck's December 13, 2005 order (vacating Magistrate Judge Diaz's dismissal of the support petition for lack of subject matter jurisdiction), Magistrate Judge Diaz's May 23, 2006 order (reinstating the petition for support), and Magistrate Judge Epps's October 1, 2008 order (denying Wallace recoupment of support payments). We are without jurisdic-

tion to consider these appeals because the notice of appeal from Associate Judge Beck's order was not filed within thirty days, *see* D.C.App. R. 4(a)(1), *In re Orshansky*, 952 A.2d 199, 207–08 (D.C.2008), and the appeals from the Magistrate Judges' orders do not lie in this court. *See* Super. Ct. Fam. R. D(e).

12. We note that in her August 5, 2009 order, Judge McKenna correctly concluded that the court did not have jurisdiction to consider Wallace's arguments from Magistrate Judge Doyle's May 5, 2009 order because his motion for review was out of time under Super. Ct. Fam. R. D(e). However, we entertain Wallace's argument on appeal because he contends that the District of Columbia courts lack subject matter jurisdiction to decide issues of child support in this case, an objection which traditionally may be raised at any point in the litigation. See discussion, *infra*, at p. 1155–56. Although we conclude, *infra*, at p. 1156, that this principle of subject matter jurisdiction does not apply in the context of the Uniform Interstate Family Support Act, we nevertheless consider Wallace's argument.

deny" the jurisdictional allegation. Then, a few lines later, he denied that he was a "bona fide resident and domiciliary of the District of Columbia, and has been for more than six months prior to the filing of this action." In the same filing, as part of his counterclaim for custody,[13] however, Wallace stated that "[h]e has practiced law and has lived in the District of Columbia for more than twenty-five years preceding the filing of this Counterclaim."[14] It was not until May 16, 2005, in his "Amended Motion to Dismiss," that Wallace affirmatively contested the jurisdiction of the District of Columbia Court to make a child support determination, alleging that none of the parties were residents of the District. In that Motion, Wallace claimed for the first time that he was a resident of Florida. When Associate Judge Beck vacated Magistrate Judge Diaz's September 29, 2005 order dismissing Upson's petition for support for lack of jurisdiction, and remanding the case for findings on the parties' residences, Wallace stated that he was a resident of Maryland. Ultimately, Magistrate Judge Diaz accepted Wallace's latest assertion and found that Wallace had been a resident of Maryland since March 23, 2004.

■■■ Against this backdrop of Wallace's seemingly opportunistic representations regarding the place of his residence, we conclude that his claim challenging the District's assertion of subject matter jurisdiction over the instant child support matter was properly rejected by the trial court. As a general rule, subject matter jurisdiction may not be waived, and an objection may be raised by the parties or by the court at any point in the litigation. *See* Super. Ct. Civ. R. 12(h)(3); *B.J.P. v. R.W.P.,* 637 A.2d 74, 78 (D.C.1994). However, "[t]he purported lack of subject matter jurisdiction based on territorial considerations—a fair characterization of the asserted defect here—has been held to be analytically similar to improper venue; it does not go to the *power* of the court to adjudicate the case, and may be waived if not asserted in [a] timely fashion."[15] *Id.* at 78–79. Statutes that impose territorial constraints on the court's assertion of subject matter jurisdiction "require[ ] the court to have a geographical relationship to a particular 'thing' or 'status,' in addition to the competence to adjudicate the type of claim at issue[.]" *Id.* at 80–81 (internal citation omitted) (Ferren, J., concurring).

■■■ The Uniform Interstate Family Support Act ("UIFSA"), codified at D.C.Code §§ 46–301.01 to –309.01 (2009 Pocket Part), governs matters of child support in the District of Columbia, and specifies territorial jurisdictional limitations on a court's assertion of subject matter jurisdiction. *See DeGroot v. DeGroot,* 939 A.2d 664, 670 (D.C.2008) ("UIFSA attempts to clarify the methods of 'establishment, enforcement, or modification of support or-

---

13. Wallace initially provided only the first page of his Answer in a supplemental appendix, and omitted the pages from his counterclaim for custody in which he admits to living and working in the District of Columbia for twenty-five years. At the request of the court, Wallace provided his entire eight-page "Answer to Petition to Establish Paternity and for Child Support and Counterclaim for Custody."

14. In Wallace's first filing in Virginia on March 2, 2005, he also stated that he had lived and worked in the District of Columbia for twenty-five years.

15. In *B.J.P., supra,* we held that the failure of the appellant to challenge the subject matter jurisdiction of the Superior Court to adjudicate a child custody dispute under the Uniform Child Custody Jurisdiction Act ("UCCJA"), D.C.Code § 16–4501 *et seq.* (1989), rendered the argument waived on appeal because "any challenge on that ground must be raised at the outset of the action." *Id.; see also* Super. Ct. Civ. R. 12(b)(1).

ders across state lines.' ") (citation omitted); D.C.Code §§ 46–302.04 & –302.05 (2001) (codifying §§ 204 & 205 of the UIFSA and referring to "jurisdiction" and "continuing, exclusive jurisdiction"). Although the UIFSA never speaks explicitly of "subject matter jurisdiction," the terms that it does use—"jurisdiction" and "continuing exclusive jurisdiction"—are simply alternative ways of referring to subject matter jurisdiction and its territorial limitations. *See* UNIF. INTERSTATE FAMILY SUPPORT ACT § 205 comment (2001), 9 U.L.A. (Part IB) 194 (2005) ("[I]f all the relevant persons—the obligor, the individual obligee, and the child—have permanently left the issuing State, the issuing State no longer has an appropriate nexus with the parties or child to justify the exercise of jurisdiction to modify its child-support order."); *Nordstrom v. Nordstrom*, 50 Va. App. 257, 649 S.E.2d 200, 204 (2007) ("As the official comment makes clear, [§ 205] provides that when a court loses continuing, exclusive jurisdiction over its prior child support order, it has no subject matter jurisdiction to modify that order."); *Sharp v. Sharp*, 336 N.J.Super. 492, 765 A.2d 271, 277–78 (App.Div.2001) ("UIFSA has engrafted into our child-support jurisprudence the concept of 'continuing, exclusive jurisdiction,' which establishes which forum has subject-matter jurisdiction over the issue of child support.") (citation omitted); *Spencer v. Spencer*, 10 N.Y.3d 60, 853 N.Y.S.2d 274, 882 N.E.2d 886, 891 (2008) ("Because the father still resides in Connecticut, that state has continuing, exclusive jurisdiction of the child support order [under the UIFSA] and New York does not have subject matter jurisdiction to modify that order."). *McLean v. Kohnle*, 940 So.2d 975, 980 (Miss.Ct.App.2006) ("Because the Virginia court maintains continuing, exclusive jurisdiction under the UIFSA, Mississippi does not have subject matter jurisdiction to hear Kohnle's petition for modification[.]"). Thus, we hold

that under the UIFSA, territorial jurisdiction is waivable, and any challenge to the subject matter jurisdiction of the court based on territorial limitations in child support proceedings must be raised at the outset of the litigation. *See B.J.P., supra,* 637 A.2d at 78–79.

 Here, Wallace did not contest the Superior Court's assertion of subject matter jurisdiction in his answer and counterclaim and thus failed to timely challenge the exercise of jurisdiction by the District of Columbia Courts. He argues in his brief on appeal that he " 'suggested' the lack of jurisdiction by explicitly denying the critical jurisdictional allegation of the Petition at the very outset of the proceeding—and before a single hearing was held." Despite Wallace's characterization of his actions as a timely objection, he did not in fact deny Upson's jurisdictional allegation in his answer and counterclaim. Rather, he asserted that Upson's jurisdictional statement was an allegation that he was "not required to admit or deny." Wallace also made contradictory statements in his submission to the court—both denying that he was "a bona fide resident and domiciliary of the District of Columbia," and stating that "[h]e has practiced law and has lived in the District of Columbia for more than twenty-five years preceding the filing of this Counterclaim." We are satisfied that any "suggestion" asserted by Wallace was not sufficient to apprise the trial court of a challenge to its jurisdiction. Wallace only affirmatively challenged the subject matter jurisdiction of the court in his May 16, 2005 "Amended Motion to Dismiss," exactly nine months after Upson filed her petition for support, and approximately one month after the mother and child moved from Virginia to the District. Therefore, Wallace has waived the argument.

Moreover, even assuming that Wallace did not waive his claim of lack of jurisdiction, the March 2, 2005 filing by Wallace in the Virginia Court did not divest the Superior Court of jurisdiction, as he argues on appeal. Under D.C.Code § 46–302.04, which codified § 204 of the UIFSA:

(b) A tribunal of the District may not exercise jurisdiction to establish a support order if the petition or comparable pleading is filed before a petition or comparable pleading is filed in another state if:

(1) The petition or comparable pleading in the other state is filed before the expiration of the time allowed in the District for filing a responsive pleading challenging the exercise of jurisdiction by the District; (2) The contesting party timely challenges the exercise of jurisdiction in the District; and (3) If relevant, the other state is the home state of the child.

Wallace's first filing in Virginia was a "Verified Petition for Child Custody and Visitation" in March of 2005, which was submitted approximately six months after he filed his answer and counterclaim to Upson's support petition. The District properly continued to exercise jurisdiction over the support matter pursuant to D.C.Code § 46–302.04 because, even assuming Wallace's Virginia petition requesting custody was a "comparable petition" to Upson's District of Columbia petition seeking support, (1) the Virginia petition was filed well after the expiration of time for filing a responsive pleading in the District, and (2) Wallace did not timely challenge the exercise of jurisdiction by the District, as we have discussed above. Thus, we conclude, in these circumstances, that the Superior Court of the District of Columbia properly exercised subject matter jurisdiction over this child support matter.

## Challenge to the Amount of the *Pendente Lite* Award

■ Both Upson and Wallace argue that the November 22, 2004 order of *pendente lite* child support in the amount of $4,000 per month, and the August 5, 2009 order affirming that order and granting $4,000 per month to Upson retroactive to the birth of Georgiana, were an abuse of discretion and clearly erroneous as a matter of law. We review child support orders for an abuse of discretion, unless the matter involves the application of a legal principle, in which case our review is *de novo. Sollars v. Cully,* 904 A.2d 373, 375 (D.C. 2006).

Upson argues that the amount of $4,000 per month is an "arbitrary and capricious amount," determined with "utter disregard for the consideration of the statutory requirements." She asserts that the court did not adequately "take into account the standard of living of the biological father," [16] and that a higher monthly support payment was necessary in such "an extraordinary high income case." Although Wallace agrees that the $4,000 amount was erroneous, he argues that it was an excessive amount, "not entered to maintain the *status quo,*" but was determined without even proffers of the evidence on "the income of either parent, the custodial arrangement for the child or any of the other factors relevant to a ruling."

■ Under D.C.Code § 16–916(a), parents have an obligation to support their minor children, and the trial court may, in its discretion, order a parent to pay *pendente lite* child support. *See also W.M. v. D.S.C.,* 591 A.2d 837, 842 (D.C.1991) (hold-

**16.** The record reflects that Wallace's income was approximately $2 million per year. *See* note 17, *infra.*

ing that both children born in and out of wedlock may receive *pendente lite* support). *"Pendente lite"* is defined as "pending the lawsuit; during the actual progress of a suit; during litigation" and so *pendente lite* child support "is, by definition, interim and transient[.]" *Johnson v. Washington,* 756 A.2d 411, 416–17 (D.C. 2000) (citations omitted). We agree with Associate Judge McKenna's conclusion in her August 5, 2009 order, that Magistrate Judge Diaz's November 22, 2004 order awarding Upson *pendente lite* child support in the amount of $4,000 per month was not an abuse of discretion. Despite some inappropriate statements made while urging the parties to settle, the record reflects that Magistrate Judge Diaz properly considered the incomes and lifestyles of the parties, the reasonable needs of the minor child, and the Child Support Guidelines in determining support.

The Child Support Guidelines ("Guidelines"), codified at D.C.Code § 16–916.01 (2009 Supp.), generally govern child support awards in the District of Columbia, including *pendente lite* awards. *See Hight v. Tucker,* 757 A.2d 756, 759 (D.C.2000); D.C.Code § 46–301.01 (defining "support order" to include temporary orders). At the time of the hearing before Associate Judge McKenna, the 1990 version of the Guidelines was undergoing major revision and the District of Columbia Child Support Guideline Commission ("Commission") had publicly released its Report and Final Recommendations ("Report") in July 2004, including a revised version of the Guidelines. The record reflects that Magistrate Judge Diaz considered both the 1990 Guidelines and the revised version accompanying the Commission's Report when determining the appropriate amount of support in this case.

Although the Guidelines apply presumptively in most cases, *see* D.C.Code § 16–916.01(p), the most recent version of the Guidelines states that they "shall not apply presumptively in cases where the parents' combined adjusted gross income exceeds $240,000 per year[,]" D.C.Code § 16–916.01(h), while the older 1990 version did not presumptively apply to a combined income exceeding $75,000 per year. Magistrate Judge Diaz considered that the combination of Wallace's annual income of $2.1 million [17] and Upson's lack of any income was well beyond the $75,000 cap which applied at that time, that Wallace was already paying $4,000 per month in support for three other children from a previous marriage, and that Wallace would likely be obligated to pay $3,091 per month if the case had been filed in Virginia, where child support guidelines did not cap out at higher income levels.

The record also reflects that the court considered a "financial statement," provided by Upson to the court, listing the expenses related to the child. Wallace argues that Upson was required to prove the expenses that she incurred on behalf of Georgiana. But, we have held that the trial court is not required to base a child support award on the child's documented expenses where the noncustodial parent's income exceeds the highest amount to which the Guidelines presumptively apply. *Galbis v. Nadal,* 626 A.2d 26, 31 (D.C. 1993). Rather, the court can award a level of support commensurate with the income and lifestyle of the noncustodial parent. *Id.* Thus, we cannot say that the court abused its discretion after considering the

---

**17.** During the hearing, Magistrate Judge Diaz considered Wallace's annual income of $2.1 million in determining a support award. Wallace never objected to the use of this number to represent his annual earnings, and in fact, Wallace's counsel suggested to the court that it assume "that Mr. Wallace's income is two million dollars a year[.]"

relevant factors, including Wallace's income and lifestyle, and concluding that $4,000 per month was not an inappropriate award to support the parties' child.[18]

### Upson's Entitlement to Child Support Payments When She Did Not Have Custody

■ Upson argues before us that she is still entitled to child support, even though Wallace has had sole legal and physical custody of Georgiana since March 1, 2007, pursuant to the order of the Virginia court, and that Associate Judge McKenna erred by upholding Magistrate Judge Doyle's April 1, 2009 and May 5, 2009 orders denying her requests for emergency and permanent child support. As both Magistrate Judge Doyle and Associate Judge McKenna noted, Upson does not have physical custody of Georgiana, nor was there evidence that she had obtained a right to visitation, at least at the time of the orders at issue.[19] Under the current Guidelines, a child must spend 35% or more of the time during the year with each parent in order for a court to award support to a secondary custodian. D.C.Code § 16–916.01(q)(1). Without custody of or visitation with Georgiana, Upson is not entitled to child support.

■ Upson insinuates that she is entitled to an award from Wallace—either a new award of child support or a continuation of the previously ordered *pendente lite* support—in order to finance her day-to-day needs, and in the event that she will obtain custody of Georgiana in the future. However, an award of support is "not designed to continue in perpetuity where the

reason for the award has ceased to exist," *DeGrazia v. DeGrazia*, 741 A.2d 1057, 1059 (D.C.1999), and Upson was not entitled to an award of child support, or a continuation of *pendente lite* support, after Wallace was granted physical and legal custody of Georgiana by the Virginia court. Because Upson is no longer providing for the needs of the child, Associate Judge McKenna did not abuse her discretion in affirming Magistrate Judge Doyle's 2009 orders, denying Upson's requests for child support.

### Challenge to the Child Support Credit Awarded to Wallace for a Cash Payment Made Before Georgiana's Birth

■ Upson also contends that under D.C.Code § 16–916.01(v)(3), Magistrate Judge Diaz erroneously granted, and Associate Judge McKenna erroneously upheld, a $10,000 "credit" to Wallace based on a payment he made to Upson prior to Georgiana's birth. We review this issue of law *de novo*. *United States v. Scott*, 987 A.2d 1180, 1188 (D.C.2010). Pursuant to § 16–916.01(v)(3), the court may credit "voluntary payments or contributions to the child's expenses" by "the parent with the legal duty to pay support" to a retroactive award of child support if such payments were made in a "period not to exceed the 24 months preceding the filing of the petition or request for child support[.]" D.C.Code § 16–916.01(v)(1) & (3). Wallace made a payment of $10,000 to Upson during her pregnancy with Georgiana, a time period that falls within the twenty-four-month time frame prior to Upson's

18. Wallace also argues that he is entitled to recoupment because Upson "was effectively given a credit for over $123,000 in *pendente lite* child support payments [ ] during the pendency of the litigation without any proof that any expenses were incurred by her on behalf of the child." The *pendente lite* child support paid by Wallace to Upson was not a credit,

but was support due to the child while Upson had custody of Georgiana. Because we affirm the $4,000 award of *pendente lite* support, Wallace is not entitled to recoup any previous payments.

19. *See* note 22, *infra*.

August 16, 2004 request for support.[20] Under the plain language of § 16–916.01(v), we are satisfied that the rulings on this point by the trial court were correct. Accordingly, Upson's claim is rejected.

### CHILD CUSTODY PROCEEDINGS IN DISTRICT OF COLUMBIA AND VIRGINIA

### Facts and Procedural History

Upson first requested sole legal custody of Georgiana in her August 16, 2004 petition filed in the District of Columbia Superior Court ("D.C. Support Case"/Case No. 2004 PCS 1375). Wallace counter claimed for custody, but both Upson and Wallace later withdrew their requests. Although issues of child support continued to be litigated in the District, child custody proceedings were initiated in Virginia on March 2, 2005, when Wallace filed for custody of Georgiana in Alexandria, Virginia ("Virginia Custody Case"). After Georgiana's birth on May 30, 2004, both Upson and Georgiana lived in the Commonwealth of Virginia, but around April of 2005, Upson and Georgiana moved to the District of Columbia. On April 18, 2005, despite the custody proceedings that had been initiated in Virginia, Upson filed for custody of Georgiana in the District of Columbia ("2005 Complaint for Custody"/Case No. 2005 DRB 1080). Upson later voluntarily dismissed this complaint and filed an answer and counterclaim for custody in response to Wallace's Virginia petition, and filed her own Verified Petition for Custody in Virginia. The Alexandria District Court granted joint custody to both parents on January 10, 2006, and Wallace appealed the custody determination to the Virginia Circuit Court.

While the Virginia proceedings were ongoing, Upson returned to the District of Columbia Superior Court and filed a Petition for a Civil Protection Order ("CPO") on May 1, 2006, seeking custody of Georgiana (Case No. 2006 CPO 1259). On May 25, 2006, Associate Judge Judith Bartnoff dismissed the CPO petition in deference to the pending Virginia proceedings. The day before Judge Bartnoff dismissed Upson's petition for a CPO in the District of Columbia, Upson filed a "Notice and Motion to Determine that Virginia is an Inconvenient Forum and/or no Longer has Continuing Jurisdiction," in the Virginia Custody Case, arguing that Virginia should decline to exercise jurisdiction over the custody matter since Upson and Georgiana no longer lived in Virginia. This motion was denied on June 2, 2006.

Almost simultaneously, Upson filed another complaint for custody in the District of Columbia on May 23, 2006 ("2006 Complaint for Custody"/Case No. 2006 DRB 1756). Wallace filed a motion to dismiss the complaint and for Rule 11 sanctions, arguing that the District of Columbia Courts lacked subject matter jurisdiction to adjudicate custody while the Virginia proceedings were ongoing. Associate Judge Odessa Vincent interpreted Upson's failure to respond to the motion as a concession and granted the motion. After Wallace filed an affidavit of attorney's fees, Judge Vincent ordered Upson's attorney, Patrick Merkle, to pay $1,932.50 in attorney's fees to Wallace on September 15, 2006. Merkle failed to pay the fees, and on April 23, 2007, Judge Vincent found Merkle in contempt based on his willful failure to comply with the sanctions order. Merkle later purged his contempt by making the payment.[21]

---

**20.** Georgiana was born on May 30, 2004, so any payment made by Wallace during Upson's pregnancy would have occurred, at most, twelve months before Upson's petition for support.

**21.** No appeal was taken either from the order directing Merkle to pay the attorney's fees or the order of contempt.

In the fall of 2006, the Virginia Custody Case went to trial in the Circuit Court. On December 22, 2006, an interim custody decree was issued in Virginia, granting custody to Wallace and suspending visitation to Upson.[22] In January 2007, Upson filed an Application for an Emergency Order for Custody and Visitation in the District of Columbia Support Case (Case No. 2004 PCS 1375). Magistrate Judge Epps dismissed this custody claim on January 23, 2007. Associate Judge Juliet McKenna affirmed Magistrate Judge Epps's dismissal of the custody claim in an order dated April 2, 2007, concluding that Virginia was the home state of Georgiana under the Uniform Child Custody Jurisdiction Enforcement Act, and therefore custody was properly before the Virginia courts and could not be litigated in the District of Columbia.

The same day that Magistrate Judge Epps dismissed Upson's effort to adjudicate custody within the District of Columbia Support Case, Upson filed yet another complaint for custody in the District of Columbia Superior Court. ("2007 Complaint for Custody"/Case No. 2007 DRB 0226). In response, Wallace filed a motion to dismiss and for Rule 11 sanctions and the court held an evidentiary hearing on April 23, 2007. Associate Judge Vincent dismissed the complaint for lack of jurisdiction and assessed sanctions of $38,478 on Upson's attorney, Patrick Merkle, on July 13, 2007, to be paid before September 13, 2007. On August 1, 2007, Upson, through Merkle, filed a motion requesting (1) that Associate Judge Vincent vacate her July 13, 2007 order, (2) that she recuse herself, (3) that Upson and Merkle be granted a new trial on the motion to dismiss and for Rule 11 sanctions, or in the alternative, a stay pending appeal, and (4) the immediate entry of an emergency visitation order. On September 24, 2007, Associate Judge Vincent granted the request for recusal, and the remaining issues were transferred to Associate Judge Jerry Byrd. In an order dated February 24, 2008, Associate Judge Byrd denied the motion to vacate the July 13, 2007 order of sanctions and for a new trial, and concluded that the court did not have the jurisdiction to enter an emergency visitation order. Judge Byrd also ordered a hearing on the motion to stay execution of sanctions pending appeal to be scheduled on March 18, 2008.

After the hearing on the motion to stay, Associate Judge Byrd issued an order on March 20, 2008, finding Merkle in contempt for failing to pay the July 13, 2007 sanction order. Because Merkle claimed indigence, Merkle was ordered to produce financial documents and make himself available for a deposition by April 17, 2008. Merkle did not provide his financial documents nor make himself available for a deposition, so on May 1, 2008, Judge Byrd again found Merkle in contempt for failing to comply with the court's discovery order. Merkle then made payment in full to Wallace, purging himself of the court's contempt ruling. Merkle appealed[23] the Feb-

---

**22.** Wallace was initially granted custody of Georgiana in an oral ruling on December 7, 2006. Visitation with Upson was suspended in the December 22, 2006 order based on evidence that Upson "was unlawfully withholding the child from the Father." On December 22, 2006, the Virginia court also issued a *capias* for Upson's arrest and a decree to show cause why Upson should not be held in contempt for her failure to abide by the court's December 7 ruling.

**23.** Merkle also appealed the March 20, 2008 order of contempt for failure to pay attorney fees ordered for a violation of Rule 11 (Appeal Nos. 08–FM–000450 & 08–FM–000555). Because Associate Judge Byrd did not impose a sanction for contempt in the March 20 order, it is not a final order, and we are without jurisdiction to entertain this appeal. *See In re Cys,* 362 A.2d 726, 728–29 (D.C.1976).

ruary 24, 2008 order denying his motion to vacate the July 13, 2007 order assessing $38,478 in sanctions, and denying his request for a new trial (Appeal No. 08–FM–000435).[24]

On March 1, 2007, a final custody decision was issued in the Virginia Custody Case, granting sole physical and legal custody to Wallace. Visitation with Upson was suspended until "such time as the Mother submits to any Court of competent jurisdiction a plan for visitation between the Mother and the minor child that is in the best interest of the minor child which provides the Court with sufficient assurances and security that the Mother will abide by the orders of the Court." Dissatisfied with the custody decision, Upson again sought custody in Virginia in November of 2007 in an emergency motion. Her motion was denied on December 28, 2007.

On December 13, 2007, Upson, acting pro se,[25] filed another petition for a CPO (Case No. 2007 CPO 3691). She alleged that she feared for her safety and that of her daughter because Wallace had taunted her several times in the summer and fall of 2007, and because he had used police assistance to obtain custody of Georgiana from Upson's residence on December 22, 2006. On December 27, 2007, Upson supplemented her CPO request to allege that Wallace had again taunted her after the hearing in Virginia on December 26, 2007, that his counsel had physically accosted her at that time, and that she had recently discovered

a pending assault charge filed by a neighbor against Wallace. Upson also requested a Temporary Protection Order ("TPO"). Associate Judge Jose Lopez held an *ex parte* hearing, where the judge asked Upson whether there was a court order providing for custody of the parties' daughter. Upson replied, "Yes. In the District of Columbia I have a *pendente lite* order. There is also an order which I assert lex (phonetic) jurisdiction from Virginia." Based on this statement, and Upson's representations of her fear of Wallace, Associate Judge Lopez granted Upson's request and issued a TPO after finding that there was "probable cause to believe that an intra-family offense had occurred." As to custody, Associate Judge Lopez checked the temporary custody box of the form TPO and stated in court that "[c]ustody of the minor child shall be left under the provisions of the [*pendente lite* order in] the custody case [ ] D.C. Superior Court 2004 PCS 1375." Upson then took the TPO and the *pendente lite* order to the Montgomery County Police, who helped her obtain physical custody of Georgiana from Wallace.[26]

The next day, Wallace filed an emergency motion to dissolve the TPO. Associate Judge Lopez held an *ex parte* hearing with Wallace, where he represented himself and retained three other lawyers for various tasks. Wallace argued that Upson had fraudulently obtained the TPO by claiming that the *pendente lite* order granted her custody, had failed to disclose the existence of the Virginia custody order, and

---

**24.** Although Merkle did not file a timely notice of appeal from the July 13, 2007 order of sanctions, under D.C.App. R. 4(a)(4)(A), Merkle's timely motion to vacate the order and for a new trial tolled the time for noting an appeal. Merkle then noted a timely appeal from the February 24, 2008 order which disposed of his motion. *See Bansda v. Wheeler,* 995 A.2d 189, 194 (D.C.2010). Although the appeal from the February 24, 2008 order is docketed under *"Upson v. Wallace,"* instead

of under *"In re Merkle"* in this court (in part because the February 24, 2008 order also disposed of issues relating to Upson) the title of the appeal does not affect our jurisdiction to consider the merits of Merkle's appeal.

**25.** Merkle had ceased representing Upson.

**26.** Wallace became combative with the police when they tried to take Georgiana from his home, and was subsequently arrested.

had improperly used the TPO to gain custody. Based on Wallace's representations, Associate Judge Lopez dissolved the TPO by order, noting that Upson "was aware that the Court's Temporary Protection Order was not intended to modify and did not modify any custody rulings, including the Final Custody Decree of the Virginia Circuit Court." Associate Judge Lopez also ordered Upson to show cause why she should not be held in contempt and why sanctions should not be imposed.

On January 10, 2008, Associate Judge Linda Turner held a consolidated hearing on Upson's CPO petition and Associate Judge Lopez's show cause order for contempt and sanctions.[27] Associate Judge Turner noted that she could not rule on the contempt issue without a trial, and per Wallace's suggestion, proceeded solely on the sanctions issue, foregoing a trial. On February 11, 2008, Associate Judge Turner issued an order, citing Associate Judge Lopez's finding that Upson was aware that the TPO did not alter the Virginia custody decree and stating that Upson's " 'obstinacy' is the driving force behind this action." Pursuant to the court's inherent authority, Judge Turner directed Upson to pay Wallace's attorney's fees in the amount of $22,488.50, compensating Wallace for the services of three attorneys, a private investigator, and for his own time, which Wallace computed at his law firm rate of $875 per hour. Upson appeals from the February 11, 2008 order of sanctions (Appeal Nos. 08–FM–001278 & 08–FM–001279). Upson also appeals from Associate Judge McKenna's April 2, 2007 order dismissing her custody claim within the District of Columbia Support Case (Appeal No. 07–FM–000572), Associate Judge Vincent's July 13, 2007 order dismissing her 2007 Complaint for Custody, and Associate Judge Byrd's February 24, 2008 order denying her request for emergency visitation (Appeal Nos. 08–FM–000435 & 08–FM–000436), all based on the District of Columbia's lack of subject matter jurisdiction.

### Jurisdiction of the Virginia Court on Child Custody Issues

Upson argues that the April 2, 2007, July 13, 2007, and February 24, 2008 orders erroneously dismissed her requests for custody and visitation for lack of subject matter jurisdiction. Throughout her brief on appeal, and as she has for much of the history of this case, Upson argues that Virginia lacked jurisdiction to adjudicate custody since she and Georgiana moved from the Commonwealth into the District of Columbia in April of 2005. She argues that the District of Columbia, as the residence of all interested parties since April of 2005, was and is the proper place to adjudicate custody of Georgiana. We review this issue of law *de novo*. *Keeton, supra*, 987 A.2d at 1121 n. 5.

The Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), codified in the District of Columbia at D.C.Code §§ 16–4601.01 to –4605.03, enumerates the requirements for a state to exert subject matter jurisdiction over a child custody dispute.[28] Under the UC-

---

27. Both Upson and Wallace were present *pro se*.

28. The purposes of the UCCJEA are to:
(1) Avoid jurisdictional competition and conflict with courts of other States in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;
(2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child;
(3) Discourage the use of the interstate system for continuing controversies over child custody;
(4) Deter abductions of children;

CJEA, a state may exercise subject matter jurisdiction over a custody matter if it is the "home state of the child on the date of the commencement of the proceeding." *See* D.C.Code § 16–4602.01(a)(1) & (2). The "home state" is the "state in which a child lived with a parent . . . for at least 6 consecutive months immediately before the commencement of a child custody proceeding." *See* D.C.Code § 16–4601.01(8). The jurisdiction of the court is determined at the onset of the custody proceeding, and continues until a court of competent jurisdiction determines that it no longer has continuing, exclusive jurisdiction. *See* D.C.Code §§ 16–4602.01(a)(1) & (2), – 4602.02(a); UNIF. CHILD CUSTODY JURISDICTION AND ENFORCEMENT ACT § 202 comment (1997), 9 U.L.A. (Part IA) 675 (1999) ("Jurisdiction attaches at the commencement of a proceeding. If State A had jurisdiction under this section at the time a modification proceeding was commenced there, it would not be lost by all parties moving out of the State prior to the conclusion of proceedings."). Pursuant to D.C.Code § 16–4602.06(a):

> [A] court of the District may not exercise its jurisdiction under this subchapter if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity with this chapter, unless the proceeding has been terminated or is stayed by the court of the other state because a court of the District is a more convenient forum under section 16–4602.07.

 Although Upson and Georgiana moved to the District of Columbia in April of 2005, under the UCCJEA, Virginia was the home state of the child when Wallace initiated a custody proceeding in the Commonwealth on March 2, 2005, because Georgiana had lived in Virginia since her birth on May 30, 2004. Since Virginia had jurisdiction at the outset of the custody proceedings, Virginia continued to have exclusive, continuing jurisdiction under the UCCJEA until the conclusion of the custody matter, despite the fact that Upson and Georgiana ceased to live there. *See* D.C.Code §§ 16–4602.01(a)(1) & (2), – 4602.02(a). When Upson filed the 2007 Complaint for Custody, an interim custody decree had been issued in Virginia, but the final custody order had not. The District could not exercise jurisdiction over the custody matter under D.C.Code § 16–4602.06(a) because the Virginia proceeding was never stayed, since Upson's "Notice and Motion to Determine that Virginia is an Inconvenient Forum and/or no Longer has Continuing Jurisdiction" was denied by the Virginia court, and a final custody order had not yet been issued.[29] Although Upson's August 16, 2004 petition for child support and child custody was the first filing in either the District or in Virginia, Upson voluntarily withdrew her request for child custody in the District and began litigating in the Virginia custody action initiated by Wallace. The UCCJEA is intended to prevent competing custody proceedings in different states, and its operation in this case did just that, allowing for a custody determination to proceed to its conclusion in Virginia.[30] Because Virgi-

---

(5) Avoid relitigation of custody decisions of other States in this State;

(6) Facilitate the enforcement of custody decrees of other States[.]

UNIF. CHILD CUSTODY JURISDICTION AND ENFORCEMENT ACT § 101 comment (1997), 9 U.L.A. (Part IA) 657 (1999).

**29.** The "Final Order of Custody" was issued on March 1, 2007.

**30.** The issue of whether Virginia has exclusive, continuing jurisdiction over the custody matter is governed by § 202 of the UCCJEA. *See also* D.C.Code § 16–4602.02. We do not decide this issue.

nia was the "home state" of Georgiana when the Virginia custody proceedings began, and the proceedings were not stayed or terminated, the District of Columbia did not have jurisdiction to adjudicate custody, and the three orders on appeal were properly dismissed by the District of Columbia Superior Court.

## The Trial Court's Sanctions Rulings

Finally, Upson appeals from Associate Judge Turner's February 11, 2008 order imposing sanctions pursuant to the court's "inherent power to police itself," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), also known as "bad faith sanctions." In a separate appeal, Merkle appeals from Associate Judge Byrd's July 13, 2007 order, imposing sanctions under Super. Ct. Dom. Rel. R. 11 for his filing of the 2007 Complaint for Custody.[31] The sanctions against both Upson and Merkle were imposed in the form of an attorney's fee award to Wallace, who proceeded *pro se* in both matters. We address the two appeals together because both require the resolution of a common issue: whether a trial court can impose a

sanction of attorney's fees, pursuant to the court's inherent power or pursuant to Super. Ct. Dom. Rel. R. 11, to be awarded to an attorney appearing *pro se* as a litigant. We hold that it cannot.[32]

### *Sanctions Under Superior Court Domestic Relations Rule 11*

■■■ Super. Ct. Dom. Rel. R. 11 sanctions are available when a "pleading, motion, or other paper" that is signed by an attorney or a party is not "well grounded in fact" nor "warranted by existing law" nor asserts "a good faith argument for the extension, modification, or reversal of existing law[.]" The Rule also allows for sanctions when the submission to the court was for "any improper purpose, such as to harass, embarrass, or cause unnecessary delay or needless increase in the cost of litigation." The court "shall impose upon the person who signed [the pleading, motion, or other paper], a represented party, or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee."[33]

**31.** *See* note 24, *supra.*

**32.** In addition to attorney's fees to compensate Wallace for his own time, the court awarded Wallace fees for work completed by three other attorneys and by a private investigator. It appears that these expenses were either the direct result of Wallace's arrest and subsequent conduct with police, for tasks typically performed by non-lawyers at lower rates, or, in the case of the private investigator, not reasonably related to the instant matter. Because the record is not entirely clear on this point, we remand this portion of the case to the trial court for Wallace, if he so desires, to present a record that supports these fees.

**33.** Super. Ct. Dom. Rel. R. 11 states in full:
Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name. A party

who is not represented by an attorney shall sign the party's pleading, motion or other paper. A name affixed by a rubber stamp shall not be deemed a signature. The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass, embarrass, or cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is signed in violation of this Rule, the Court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties

The issue of whether a *pro se* attorney litigant can receive an attorney's fee award under Super. Ct. Dom. Rel. R. 11 is one of first impression in this jurisdiction. Other jurisdictions have, however, dealt with this issue in the context of FED.R.CIV.P. 11 or its equivalent and have ruled that a *pro se* attorney litigant is not entitled to receive attorney's fees for a violation of the rule. We agree.

Although not identical to Super. Ct. Dom. Rel. R. 11, FED.R.CIV.P. 11 [34] also allows for sanctions when a "pleading, written motion, and other paper" signed by an attorney is "presented for any improper purpose, such as to harass, or to cause unnecessary delay or needless increase in the cost of litigation," or presents legal arguments not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," or includes factual contentions that do not have evidentiary support. Pursuant to FED.R.CIV.P. 11, "the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion." Both the Federal Rule and Super. Ct. Dom. Rel. R. 11 state that sanctions may include a monetary amount to cover the "expenses" that have been "incurred" by the opposing party, including "reasonable ... attorney's fees" or "a reasonable attorney's fee." [35]

Based on the language of FED.R.CIV.P. 11, the Eleventh Circuit held in *Massengale v. Ray* that attorney's fees cannot be awarded to a *pro se* attorney litigant. 267

F.3d 1298, 1301–03 (11th Cir.2001). "Because a party proceeding *pro se* cannot have incurred attorney's fees as an expense, a district court cannot order a violating party to pay a *pro se* litigant a reasonable attorney's fee as part of a sanction." The court relied, in part, on the fact that "the word 'attorney' generally assumes some kind of agency (that is, attorney/client) relationship" and that when a lawyer proceeds *pro se*, "legal fees are not truly a 'cost' of litigation—no independent lawyer has been hired (or must be paid) to pursue the ... complaint." *Id.* at 1301 (quoting *Ray v. United States Dep't of Justice*, 87 F.3d 1250, 1251 n. 2 (11th Cir.1996) (holding attorney's fees not available to *pro se* attorney litigant in a Federal Freedom of Information Act action)). Other courts have reached the same conclusion regarding similar provisions allowing for sanctions. *See Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J.Super. 510, 983 A.2d 604, 623–26 (App.Div.2009) (holding that New Jersey rule, "patterned on Fed R. Civ. P. 11," precludes a *pro se* attorney litigant from receiving attorney's fees because such fees are not "actually incurred"); *Musaelian v. Adams*, 45 Cal.4th 512, 87 Cal.Rptr.3d 475, 198 P.3d 560, 563–65 (2009) (holding that California rule, "modeled almost word for word on rule 11 of the Federal Rules of Civil Procedure," does not allow a *pro se* attorney litigant to recover sanctions in the form of an award of attorney's fees); *Beasley v. Peters*, 870 S.W.2d 191, 196 (Tex.App.1994) (holding that under Rule 13 of the Texas Rules of Civil Procedure,

---

the amount of reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee.

**34.** Super. Ct. Civ. R. 11 is identical to the pre-December 2007 version of FED.R.CIV.P. 11. *See* Super. Ct. Civ. R. 11 cmt. See note 35, *infra*.

**35.** FED.R.CIV.P. 11 was amended on December 1, 2007. The changes in the rule resulting from the amendment were "intended to be stylistic only." FED.R.CIV.P. 11, Advisory Committee Note (2007 Amendment). We have included the language of the pre-December 1, 2007 version of the rule because other courts have addressed this version when dealing with the issue at hand.

which precludes bringing a groundless suit for purposes of harassment, a *pro se* attorney litigant is not entitled to attorney's fees because "an attorney-client relationship was the predicate for that particular sanction"); *Pickholtz v. Rainbow Technologies, Inc.*, 284 F.3d 1365, 1375 (Fed.Cir. 2002) (holding that the language of FED. R.CIV.P. 37, a rule that allows for sanctions regarding discovery violations, "does not allow a *pro se* lawyer to receive fees for his own time"). We are persuaded by the foregoing authorities that a *pro se* attorney litigant cannot recover attorney's fees under Super. Ct. Dom. Rel. R. 11.

Super. Ct. Dom. Rel. R. 11, by its plain language, allows for the reimbursement of expenses and attorney's fees that have been *incurred*, not for the reimbursement of an opportunity cost suffered by a *pro se* attorney litigant. The rule presupposes a paying attorney-client relationship,[36] not the loss of income that a *pro se* litigant, whether an attorney or not, will experience due to the time and effort expended in defending against a frivolous lawsuit. *See Musaelian, supra,* 87 Cal.Rptr.3d 475, 198 P.3d at 564 ("[T]he phrase 'expenses incurred' contemplates an obligation that a party has become liable to pay. [The rule] does not provide for compensation for time lost from other employment."). *Alpert, supra,* 983 A.2d at 625 ("If a person, other than a lawyer, such as a doctor, plumber, or unskilled laborer, is the subject of frivolous litigation, appears *pro se,* and succeeds in convincing the court that his adversary has acted in a frivolous fashion, the court cannot, under the rule, reimburse the doctor, the plumber, or the unskilled laborer, the income he did not receive from his job.").

Furthermore, precedent from our own jurisdiction, and that from the Supreme Court, supports this conclusion. In *McReady v. Dep't of Consumer & Regulatory Affairs,* 618 A.2d 609, 618 (D.C.1992), we held that an attorney acting *pro se* is not eligible for an award of an attorney's fee under the District of Columbia Freedom of Information Act. In so ruling, we largely relied on *Kay v. Ehrler,* 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991), where the Supreme Court unanimously held that an attorney, proceeding *pro se,* who prevailed as a litigant was not eligible for an award of an attorney's fee under The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.C.S. § 1988 (1988). The Supreme Court stated in *Kay:*

> Even a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The adage that 'a lawyer who represents himself has a fool for a client' is the product of years of experience by seasoned litigators.

499 U.S. at 437–38, 111 S.Ct. 1435 (footnote omitted). The Supreme Court in *Kay,* and our court in *McReady,* noted that the respective statutes at issue were intended to encourage plaintiffs to seek legal advice and proceed with competent

---

**36.** We have said that the agency relationship between an attorney and client is an essential requirement for awarding fees to a *pro se,* non-attorney litigant. *Donahue v. Thomas,* 618 A.2d 601, 607 (D.C.1992) ("[S]ince no attorney-client relationship existed, appellant had no fee burden requiring alleviation. Thus, it is neither appropriate to reward him for failing to seek competent professional legal advice nor to compensate him for acting as his own attorney.").

counsel in their litigation, *Kay, supra,* 499 U.S. at 435, 111 S.Ct. 1435, *McReady, supra,* 618 A.2d at 613, but hiring competent counsel can also prevent violations under Super. Ct. Dom. Rel. R. 11. The Rule is ultimately intended to deter misconduct in submissions to the court. We believe that the reasoning articulated in *Kay,* and adopted in *McReady,* applies equally to the prevention of inappropriate court filings because the retention of independent and objective counsel can reduce the likelihood of frivolous claims in litigation.[37]

We note, however, as Wallace argues, that in one earlier case, we held that a *pro se* attorney litigant is entitled to attorney's fees under the Rental Housing Act. *See Alexander v. District of Columbia Rental Hous. Comm'n,* 542 A.2d 359, 360 (D.C. 1988). *Alexander,* however, was decided before the Supreme Court's decision in *Kay, supra,* and it cited a Ninth Circuit case that has since been repudiated in light of *Kay.*[38] In addition, as we stated in *McReady, supra,* 618 A.2d at 614, the reasoning relied on in *Alexander* set forth by the Eleventh Circuit in *Duncan v. Poythress,* 777 F.2d 1508 (11th Cir.1985), was "effectively overrule[d]" by the Supreme Court in *Kay. See also Donahue, supra* note 36, 618 A.2d at 607 n. 14. We further called into question our holding in *Alexander* in *Lenkin Co. Mgmt. v. District of Columbia Rental Hous. Comm'n,* 677 A.2d 46, 50 (D.C.1996), where we affirmed the award of fees to a *pro se* attorney litigant (the same litigant as in *Alexander*), but

only because the law of the case required us to do so. We recognized the implications of the Supreme Court's reasoning in *Kay* on *Alexander,* but concluded that "[r]eexamination of *Alexander* [ ] must wait another case" where the court engages in a "fresh examination" of the purpose of the Rental Housing Act's attorney's fee provision. *Id.* ("There is no question that *Kay,* although it concerned a federal statute . . ., bears directly upon the correctness of the reasoning in *Alexander* [ ]."). Thus, *Alexander* has no bearing on the issue before us in this case.

Because we conclude that a *pro se* attorney litigant cannot receive an award of attorney's fees under Super. Ct. Dom. Rel. R. 11, Wallace is not entitled to receive an award from Merkle under Judge Vincent's July 13, 2007 order.

### *Sanctions Under the Inherent Authority of the Court*

A court may also award a sanction in the form of an attorney's fee to a prevailing party if the opposing party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Jung v. Jung,* 844 A.2d 1099, 1107–08 (D.C. 2004). The Supreme Court has stated that such sanctions can be imposed by a court pursuant to its "inherent power to police itself." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The court explained that the impo-

---

**37.** This may be particularly true in the context of Super. Ct. Dom. Rel. R. 11, as it applies to both an attorney and a party proceeding *pro se.* A litigant proceeding *pro se,* as noted in *Kay,* may lack the "judgment of an independent third party" in submitting papers to the court. 499 U.S. at 437, 111 S.Ct. 1435.

**38.** In *Alexander, supra,* we cited *Ellis v. Cassidy,* 625 F.2d 227 (9th Cir.1980), which held

that a *pro se* attorney litigant who successfully defended against a frivolous lawsuit was entitled to an award of attorney's fees as a "bad faith sanction" against the offending party. *Ellis* has since been disavowed by that court because the Supreme Court's language in *Kay* "sweeps broadly, appearing to apply to *pro se* litigants generally." *Elwood v. Drescher,* 456 F.3d 943, 947 (9th Cir.2006).

sition of sanctions "serv[es] the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." *Id.* (citation and quotation marks omitted).

We held above that an attorney's fee under Super. Ct. Dom. Rel. R. 11 requires an attorney-client relationship, and expenses that have been incurred. Here, we hold that making the "prevailing party whole for expenses caused by his opponent's obstinacy" also requires expenses that must actually be paid to a third party attorney. "Bad faith sanctions" have a similar underlying rationale as that of Super. Ct. Dom. Rel. R. 11—to deter misconduct in submissions to the court, and improper conduct in litigation in general. *See Jung, supra,* 844 A.2d at 1107–08 (bad faith sanctions serve to "award ... attorneys' fees to punish abuses of the judicial process and deter future misconduct"); *Schlank v. Williams,* 572 A.2d 101, 108 (D.C.1990) ("The intent of [bad faith sanctions] is not to compensate worthy litigants but to deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.") (citation and quotation marks omitted); *Chambers, supra,* 501 U.S. at 46 n. 10, 111 S.Ct. 2123 (stating that the court's inherent power to sanction bad faith conduct is similar to the certification requirement under FED.R.CIV.P. 11 in that it ensures that litigation is not instigated for an "improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation"). Thus, the rationale articulated in *Kay, su-*

*pra,* promoting the retention of objective third party counsel applies just as forcefully in this context. Accordingly, Wallace, as an attorney and a *pro se* litigant in this case, cannot recover attorney's fees from Upson in the form of bad faith sanctions.

### Conclusion

We, therefore, affirm the orders of April 2, 2007,[39] February 24, 2008,[40] and August 5, 2009.[41] We affirm the order of July 13, 2007 to the extent that it affirms the dismissal of Upson's 2007 Complaint for Custody, but reverse the portion awarding attorney's fees to Wallace as a sanction against Merkle.[42] We also reverse the February 11, 2008 order awarding attorney's fees to Wallace as a sanction against Upson.[43] Finally, we remand the case on the issue of fees for the three attorneys and the private investigator retained by Wallace.

*So ordered.*

---

**39.** Appeal No. 07–FM–000572.

**40.** Appeal Nos. 08–FM–000435 & 09–FM–000436.

**41.** Appeal Nos. 09–FM–001151 & 09–FM–1620.

**42.** Appeal Nos. 08–FM–000435 & 09–FM–000436.

**43.** Appeal Nos. 08–FM–001278 & 08–FM–001279.